# GANDY vs. HUMPHRIES.

[SLANDER FOR WORDS SPOKEN CHARGING LARCENY.]

1. *Admissibility of declarations as part of res gestœ.*—On a settlement between G. and H., relative to the sale of two slaves which the former had undertaken to sell for the latter, " the papers of the parties lying on the table, G., remarking that he must go to the town of L. that evening, hastily gathered up his papers, put them in his pocket, without assorting or examining them, and immediately went out, got on his horse, and started off. As G. gathered up his papers and started off, H. also began to gather up his papers, and, not finding the bond about which they had the settlement, remarked, ' *G. has taken that paper, and he ought not to have done it,*' and went to the door to call him back ; but G. having gone some distance, though not out of sight, at the suggestion of witness that he could get the paper some other time, H. did not call him back." *Held,* that the remark of H. was admissible as a part of the *res gestœ.*

2. *Impeaching party's own witness.*—The refusal of the court to permit a party to impeach his own witness, when recalled and examined by his adversary, is not revisable on error or appeal.

3. *Relevancy and admissibility of evidence in rebuttal.*—Where the slanderous words, which are charged to have been intended as an imputation of larceny, are shown to have been spoken in reference to the act of the plaintiff in taking a bond from the defendant's possession ; and the defendant has, under the general issue, proved the circumstances under which the bond was taken from him, the plaintiff may, in rebuttal, show that he acted under the advice of counsel.

4. *Damages.*—In slander for words spoken imputing larceny, the fact that the plaintiff is a minister of the gospel, cannot be considered by the jury in

40

estimating the damages, when there is no averment of that fact in the complaint, and no claim of special damages sustained by plaintiff in that character.

APPEAL from the Circuit Court of Chambers. Tried before the Hon. JOHN GILL SHORTER.

THIS action was brought by John R. Humphries, against Alfred Gandy, to recover damages for the false and malicious speaking by defendant, of and concerning plaintiff, on the 1st May, 1856, of the following words: "That he (plaintiff) had stolen a paper from him (defendant) worth $2,100 ;" "that Humphries (plaintiff) had stolen from him (defendant) a paper worth $2,100, which was his (defendant's) property ;" "that he (plaintiff) took a paper from him (defendant), belonging to him (defendant), worth $2,100, without his (defendant's) leave, and that his mother always told him, when he took sugar without leave, that it was stealing ;" "he (plaintiff) has stolen from me (defendant) $2,100 ;" which words were alleged to have been intended to impute to plaintiff the crime of larceny. The only plea was, not guilty.

On the trial, as the bill of exceptions shows, after the plaintiff had proved, by two witnesses, the speaking of the words substantially as charged during the latter part of April, 1856, the defendant intoduced one M. C. Goldsmith as a witness, who testified as follows: "On the 24th April, 1856, plaintiff rode up to witness' house, as witness was about leaving home, and asked where he was going. Witness replied, that he was going to defendant's. Plaintiff said, that he would go with him ; that he wanted to get that paper from Mr. Gandy, (alluding to a contract for the sale of two negroes, hereinafter set out.) Plaintiff and witness went to defendant's house together. After having been there a short time, plaintiff told defendant, that he wanted to look at that bond, which he and his brother (Oxford Gandy) had given plaintiff, concerning the negroes Wat and Aleck ; that there was something about it which he did not understand. Defendant then went into another room, brought out a bundle of papers, took out the bond from among them,

and handed it to plaintiff, who opened and commenced to read it. When plaintiff had read it nearly through, he came to a word which he could not make out, or understand, and asked defendant to explain it; which the defendant did. They then commenced talking about lands in Butler county, where defendant had been; and plaintiff asked defendant, if he did not have a map of Butler county lands; to which defendant replied, that he had. Plaintiff then said, that he would like to examine it, as he had a notion of moving to Butler county. Defendant started into another room, and when he had gone five or six steps, with his back to plaintiff, plaintiff folded up the paper, and put it in his vest pocket, and smiled and winked at witness. Defendant returned with the map, which they examined a few minutes, and plaintiff and witness then left. After they had gone about sixty yards from the house, plaintiff observed to witness, that he had gone to get the bond, and he had got it. Witness replied, that he thought plaintiff had done wrong; that he ought to have told Gandy about it. Plaintiff replied, that he was a preacher, and Gandy was a violent man, and he did not wish to have any difficulty with him in his own house; and requested witness to inform Gandy that evening of his having taken the bond, and to tell him, that he had got it to protect his own rights, and not to injure Gandy; that when he (Gandy) would satisfy him about the sale of the negroes and the expenses, he would give up the paper; and that Gandy could have access to the paper in his possession. Plaintiff also said, in the same conversation, that he had laid the facts in regard to said paper before counsel, and had been advised that he was entitled to the possession of it, and that he might lawfully possess himself of it in whatever way he could, without committing a trespass or breach of the peace."

" On cross-examination of this witness, it was shown that, on the 20th December, 1855, plaintiff and defendant had a settlement in the house of said witness, and in his presence, about the proceeds of the sale of said slaves. In this settlement, defendant reported that the negroes had been sold, one at $900, and the other at $1,200; and,

after deducting expenses, commissions, &c., paid over the balance to plaintiff, and took his receipt for $2,100 ; which receipt was prepared by Gandy, and purported to be in full. Plaintiff objected to signing it, and expressed himself dissatisfied with the return of sales and account of expenses ; and thereupon witness was specially called on by the parties, to remember that, if anything was wrong, it should be thereafter corrected. This settlement took place in the afternoon. Gandy, remarking that he had to go to Loachapoka that evening, (the papers of the parties lying on the table,) hastily gathered up his papers, put them in his pocket, without assorting or examining them, and immediately went out, got on his horse, and started off. As Gandy gathered up his papers and started off, Humphries also began to gather up his papers, and, not finding the bond about which they had the settlement, remarked, 'Gandy has taken that paper, and he ought not to have done it,' and went to the door to call him back ; but Gandy having gone some distance, though not out of sight, at the suggestion of witness that he could get the paper some other time, he did not call him back. Defendant objected to the above declaration of plaintiff, which was made after defendant had left ; but the court overruled the objection, and defendant excepted."

" The defendant then read in evidence the bond and receipt alluded to by said witness, together with an obligation from plaintiff to said defendant and his brother Oxford ; which papers are in the words and figures following." (The *bond* alluded to is a written instrument, not under seal, dated the 21st February, 1855, by which defendant and his brother Oxford acknowledged that they had received two negroes from plaintiff, for sale, and promised to account to him for the proceeds of sale. The *obligation* (as it is called) of plaintiff is a writing, not under seal, dated the 21st February, 1855, by which plaintiff agreed to pay said Alfred and Oxford Gandy fifty dollars, besides expenses, for selling said negroes. The receipt given by plaintiff is sufficiently described by the witness.) " After defendant had closed his testimony, plaintiff introduced one George C. Goldsmith as a witness, who

testified as follows : In June or July, 1856, witness met defendant, on Sunday, at the house of M. C. Goldsmith. Defendant asked him, ' Has you brother Humphries got back yet from North Carolina ?' Witness replied, that he had not. Defendant then said, ' He never will come back ; but do you write to him, and tell him, that if he will come back, and behave himself, I will not prosecute him for stealing. I could put him in the penitentiary ; but, on account of his wife and children, I will not do it, if he will behave himself.' Witness then said, ' You ought not to talk so about him—he is a preacher of the gospel.' Gandy thereupon replied, ' He did steal that paper—I call it stealing ;' and further said, that he would break him from preaching—that he had consulted with the best of counsel, and they had informed him it was stealing. Plaintiff, by permission of the court, then called back to the stand the witness M. C. Goldsmith, who, when leaving the stand before, had been notified that plaintiff would desire to re-examine him further in rebuttal; and proceeded to examine him further in rebuttal. Defendant then offered to ask said witness, for the purpose of contradicting him, if he had not made certain statements,—fixing the time, place and person ; which statements were pertinent and material, but related to the testimony of the witness when examined in chief by defendant. The plaintiff objected to this, and the court sustained the objection ; to which the defendant excepted.

" Plaintiff then introduced two of his counsel as witnesses, who testified, that plaintiff, a short time before he obtained the paper from defendant in the manner stated by the witness Goldsmith, had consulted with them about the matter, and stated the facts to them ; and that they advised him, that he was entitled to the possession of the paper, and had a right to repossess himself of it in any way he could, without committing a trespass. The defendant objected to the admissibility of this evidence ; the court overruled the objection, and admitted the evidence ; and the defendant excepted.

" There was no evidence of any special damage, except what the above proof may tend to establish.

"The court charged the jury, (among other things,) that if they found for the plaintiff, they might, in estimating the damages, look to the position of the parties, their previous business relations, the question as to which one was entitled to the possession of the paper, the intent with which the plaintiff obtained the possession of it, the means by which he obtained it, the conduct of the defendant after he was advised of the facts, the time, place and circumstances, when, where and under which he uttered the words, together with the *status* of the plaintiff, and to the fact that he was a minister of the gospel, if such he was. To the last portion of said charge, instructing the jury that they might look to the fact that the plaintiff was a minister of the gospel, the defendant excepted."

The rulings of the court on the evidence, and the charge to the jury, are now assigned as error.

L. E. PARSONS, for appellant.—1. The court erred, in permitting the plaintiff to prove his own declarations to the witness Goldsmith, which were made after the defendant had left the house, and was riding away.—Martin v. Hardesty, 27 Ala. 458 ; Allen v. Prater, 30 Ala. 458 ; Brice & Co. v. Lide, 30 Ala. 649 ; Dickerson v. Hodges, 1 Porter, 99.

2. By recalling the witness Goldsmith, and examining him to make out his case, the plaintiff made him his own witness; consequently, the defendant had a right to impeach the testimony of said witness.

3. If plaintiff had been indicted for the larceny, or had sued defendant for a malicious prosecution, the opinion and advice of counsel, under which he acted, would have been competent evidence. But in this action, the only plea being not guilty, the plaintiff's intention in taking the paper was not in issue : the only question was, whether the defendant had charged him with it as stated in the declaration. Moreover, if the proof was admissible, the witness should have been required to state the facts communicated by him to his counsel, in order that it might be seen whether he stated them truly, and whether the

advice of his counsel was correct.—Hewlett v. Cruchley, 5 Taunton, 276 ; Blunt v. Little, 3 Mason, 102 ; Turner v. Walker, 3 Gill & J. 377.

4. It may be admitted, that in estimating the damages in this action, the jury can "look at all the facts and circumstances, together with the *status* of the plaintiff." But the charge of the court here instructed them, not only that they might look at all these things, but that they might also consider the further fact "that he was a minister of the gospel;" thus declaring, in effect, that one who is a minister may, when slandered, recover damages on that account to which he would not otherwise be entitled ; and that too, without averring the fact, or proving any special damage to him in that respect. The plaintiff's rank and condition in life, and his business or profession, constitute separate and distinct grounds of action.—Wadsworth v. Bently, 22 Eng. L. & Eq. 176 ; Buck v. Hersey, 31 Maine, 558 ; Ware v. Clowny, 24 Ala. 706 ; 2 Starkie on Slander, 1 ; 5 Johns. 220.

WM. P. & THOS. G. CHILTON, *contra.*—1. The plaintiff's declarations, to the admission of which the defendant objected, constituted a part of the *res gestæ.*—1 Greenl. Ev. § 108 ; 5 Maryland, 450; 10 Geo. 615 ; 7 Watts, 39.

2. Goldsmith was the defendant's own witness, and could not be discredited by him.—Bradford v. Bush, 10 Ala. 386 ; Winston v. Mosely, 2 Stewart, 137 ; 7 Watts, 39 ; 8 Watts, 447 ; 5 Wendell, 305 ; 12 Wendell, 105; 21 Wendell, 190 ; 4 Pick. 179.

3. The opinion and advice of counsel, under which the plaintiff acted in getting possession of the paper, was competent evidence for him.—Hill v. Ward, 13 Ala. 312 ; Chandler v. McPherson, 11 Ala. 919; Blunt v. Little, 3 Mason, 102. Besides, the act of taking the paper, in rebuttal of which this evidence was offered and admitted, was not competent testimony, because it was not shown to be the immediate and proximate cause of the speaking of the slanderous words.—2 Starkie on Slander, 95 ; 7 Wendell, 560 ; 13 Pick. 503 ; Moore v. Clay, 24 Ala. 236 ; Rochester v. Anderson, 1 Bibb, 428 ; Avery v. Ray,

1 Mass. Rep. 12; 6 Munford, 465; 19 Johnson, 319.

4. The charge of the court was correct. That the plaintiff, in an action of slander, has a right to show his degree and condition in life, see Larned v. Buffington, 3 Mass. 550; Shute v. Barrett, 7 Pick. 86; 2 Greenl. Ev. §§ 89, 269.

R. W. WALKER, J.—It is extremely difficult, if not impossible, to settle by exact definition what declarations are to be considered as forming parts of the *res gestæ*. It has been said, in general terms, that the idea of the *res gestæ* presupposes a main fact, and includes only such circumstances, facts and declarations as grow out of the principal transaction, are contemporaneous with it, and serve to illustrate its character.—Lund v. Tyngsborough, 9 Cushing, 36; Carter v. Buchanan, 3 Kelly, 517; 1 Greenl. Ev. § 108. The imperfection of this definition has, however, been frequently admitted; and, as is the case with most legal generalites, many difficulties have been found in its application to the various cases which have arisen in practice. When it is said that declarations, to be admissible as parts of the *res gestæ*, must be contemporaneous with the principal transaction, it is not meant that they shall be exactly coincident in point of time with the main fact. If they appear to spring out of the transaction—if they serve to elucidate it, and are made so shortly after the happening of the main fact, as to stand in the relation of unpremeditated result to it, the idea of deliberate design in making them being fairly precluded by the surrounding circumstances, then they may be regarded as contemporaneous.—Mitchem v. State, 11 Geo. 625; Commonwealth v. McBride, 3 Cushing, 181; Handy v. Johnson, 5 Maryland, 450; Hart v. Powell, 18 Geo. 639; Lund v. Tyngsborough, 9 Cushing, 36; Carter v. Buchanan, 3 Kelly, 517; Rawson v. Haigh, 2 Bing. 99; Traun v. Keiffer, 31 Ala. 137; 1 Greenl. Ev. § 108, and notes. The declaration of the plaintiff, the admission of which was one of the matters excepted to on the trial, answers all of these conditions, and we think there was no error in permitting it to go to the jury.

2. The general rule is, that a witness is to be considered throughout the trial as the witness of the party who first caused him to be summoned, sworn and examined. While we will not say that there may not be cases, in which the court might, in its discretion, permit a party to impeach one of his own witnesses, after the opposite party had recalled and examined him as a witness to make out his case; we think it clear, that the refusal of the court to allow this to be done, is not a matter which can be the subject of revision here.—1 Greenl. Ev. § 447; Burke v. Miller, 7 Cushing, 547; 2 Phill. Ev. (C. & H's notes,) ed. 1843, p. 781.

3. The bill of exceptions does not inform us of the purpose for which the defendant offered the evidence showing the manner in which the plaintiff took the bond out of the defendant's possession. The only plea put in by the defendant appears to have been "*not guilty.*" But under the Code, (§ 2226,) in actions of slander, the truth of the words spoken may be given in evidence under the general issue, in mitigation of damages. If the evidence referred to was offered as tending to establish the truth of the words spoken, it is obvious that the court did not err in permitting the plaintiff to prove that, in taking the bond, he acted under the advice of counsel. And if the action of the court below on this point could not be sustained on any other hypothesis, we would be bound to presume that the evidence of Goldsmith was introduced to prove the truth of the charge made against the plaintiff.

If, however, as is more probable, the taking of the paper was introduced to show the immediate provocation, under the excitement of which the words were spoken, we still think there was no error in permitting the plaintiff to prove the advice of counsel under which he acted. Such testimony tended to explain the true character of the act which the defendant relied on as the provocation which led to the speaking of the slanderous words. The more wanton the provocation, the greater the mitigation which the slander would receive from it. How far the provocation was wanton, was, then, a material consideration in the assessment of the damages. The testimony

of Goldsmith, standing alone, was well calculated to place the plaintiff before the jury in the attitude of a willful wrong-doer. The evidence showing the advice which the plaintiff's counsel had given him, tended to relieve him from this position, and, by explaining the motives under which he acted, served to place the alleged provocation before the jury in its true proportions.—Hill v. Ward, 13 Ala. 312; Chandler v. McPherson, 11 Ala. 916.

Supposing that the taking of the bond was offered to show the provocation which induced the slander, its admissibility in evidence would depend upon the question, whether that transaction was the immediate or proximate cause of the speaking of the words.—Moore v. Clay, 24 Ala. 237; 1 Amer. Lead. Cases, 205–6. Into that inquiry we need not, and do not enter; for, whether the evidence of that transaction was legal or illegal, the testimony which the plaintiff introduced in explanation of it was properly admitted.—Blakey v. Blakey, 33 Ala. 621; Nelson v. Iverson, 24 Ala. 9.

4. The court charged the jury, that in estimating the damages, " they might look to the fact, that the plaintiff was a minister of the gospel, if such he was." There was no averment in the complaint, that the plaintiff was a minister of the gospel; nor was there either averment or proof of any special damage sustained by him in his character of minister. The charge, therefore, gives rise to the single question, whether the fact that the plaintiff is a minister of the gospel, is an element to be considered in enhancement of the damages to which he is entitled. If that was a circumstance proper to be considered in estimating the damages, so also would be the fact, that the plaintiff was a physician, merchant, mechanic, lawyer, school-teacher, or belonged to any other particular profession or class of citizens. Any defamatory words, that necessarily or naturally tend to injure a man in his profession, office, or business, are actionable. But, if a party claims damages done to him in any special character, as attorney, physician, minister, tradesman, or the like, he must sue in that character. If follows, that where the suit is to recover merely for damages to the plaintiff as

an individual, he cannot recover for damages due him in his profession.—1 Am. L. C. 99 ; 2 Starkie on Slander, p. 1, &c. ; Wadsworth v. Bently, 22d Eng. L. & E. 176. In such a suit, the profession or calling of the plaintiff should not be considered by the jury, unless, indeed, we assume that the measure of damages is, to some extent, dependent upon the plaintiff's pursuit. This assumption would be unjust, and wrong in principle. Whether a slander suit be regarded as having for its object compensation for an injury done to the plantiff's character, atonement for wounded feelings, or the punishment of the wrong-doer, there is no propriety in recognizing the *profession* of the plaintiff as a matter to be considered by the jury in aggravation of the damages. Neither the value of character, nor the delicacy of feeling, nor the enormity of the slander, can be graduated according to the pursuit of the slandered individual.

We find some American authorities which hold, that the plaintiff's 'rank in life,' disconnected from his character, may be shown to enhance the damages.—Larned v. Buffington, 3 Mass. R. 552 ; McAlmont v. McLelland, 14 S. & R. 359 ; Parke v. Blackiston, 3 Harrington, 373-5 ; 1 Am. L. C. 210 ; 2 Greenl. Ev. §§ 89, 269. If this be a sound rule, then, it might be true that, inasmuch as one's profession does contribute to fix his rank in life, the jury should be permitted to look to it in estimating the damages. But the rule adverted to is hostile to the genius of our institutions, and we are not willing to follow it. We are not able to discover any sound principle, on which the plaintiff's high or humble rank in society, *dissociated from his character*, can be held a proper matter for consideration in determining the amount of damages he should recover. It is often the case that the greatest worth of character is found in the humblest ranks of life, and that to persons in those ranks a good character is more valuable, and slander more injurious, than to those who are above them in social position. It is equally true, that persons destitute of the qualities which make character valuable are found in what is denominated the highest rank in life, and in all the professions, the sacred ministry not excepted.

The part of the charge which was excepted to, in effect asserts, that damages which, if the plaintiff were not a minister, he should not recover, may be allowed him because he is a minister; and we think that the court erred in giving it.

Judgment reversed, and cause remanded.