## PRESS PUB. CO. v. McDONALD.

(Circuit Court of Appeals, Second Circuit. September 12, 1894.)

### No. 152.

1. LIBEL—WHAT CONSTITUTES—QUESTION FOR JURY.
 Defendant published a dispatch reading: "Missing Millionaire [plaintiff] Located. * * * [Plaintiff], Southern Ohio manager of the Standard Oil Company until six months ago, when he strangely disappeared, has been located living in luxury" in Canada. *Held* that, since some of our countrymen who reside in Canada are fugitives from justice, of which courts may take judicial notice, whether the dispatch was libelous was a question for the jury. McDonald v. Press Pub. Co., 55 Fed. 264, affirmed.

2. SAME—EVIDENCE—PLAINTIFF'S SOCIAL STANDING.

In a civil action for libel, plaintiff's general social standing may be shown in the evidence in chief, as bearing on the question of damages.

3. SAME—PUNITORY DAMAGES.

Where defendant published an out of town dispatch, which was rendered libelous by an error in transmission, without having the same repeated to insure accuracy, punitory damages are justified on the ground of a wanton disregard of the rights of others, though repeating the dispatch would have involved extra expense and loss of time.

4. SAME—TRIAL—READING TO JURY OPINION OF ANOTHER JUDGE.

In an action for libel, where the question as to whether the article was libelous is for the jury, permitting counsel to read to the jury from the decision of another judge in overruling a demurrer to the complaint, wherein the opinion is expressed that "the first impression on reading a paragraph like this would be that the person referred to had been guilty of some breach of trust," is error.

In Error to the Circuit Court of the United States for the Southern District of New York.

At Law. Action by Alexander McDonald against the Press Publishing Company for libel. Plaintiff had judgment, and defendant brings error.

Writ of error to review a judgment of the United States circuit court, southern district of New York, entered upon the verdict of a jury giving the defendant in error the sum of $5,000 as damages for the publication of a libel upon him in the New York World, a newspaper published by plaintiff in error. A demurrer to the complaint was interposed by defendant and overruled by Judge Wallace. 55 Fed. 264. Thereafter the cause came on for trial before Judge Shipman and a jury, with the result above indicated.

John M. Bowers, for plaintiff in error.

Horace E. Deming, for defendant in error.

Before LACOMBE, Circuit Judge, and WHEELER and TOWNSEND, District Judges.

LACOMBE, Circuit Judge. The libel complained of was published under the following circumstances: One Tarbell was a regular correspondent of the World newspaper in Cincinnati, Ohio. The rules of the paper required him, when leaving his locality for a day or more, to have some one authorized to receive dispatches for him, and do his work. It was left to him to select the subordinate or substitute thus employed. Tarbell's newspaper work having become too heavy for him to handle by himself, he engaged a young man of twenty, named Gosdorfer, to look after the New York World correspondence, instructing him to send all "good news" to that paper. On August 17, 1892, the Cincinnati Evening Post, a reputable paper, published in that city, contained an article touching one Evan Smith. Believing that the substance of such article would be acceptable to the World, Gosdorfer condensed it into the following dispatch, which, on the same day, he sent over Tarbell's name by the Postal Telegraph Company. As delivered to the telegraph company at its Cincinnati office, it read:

"The World, New York. Two o'ck. * * * Evan Smith, who was confidential man for his brother-in-law, Alexander McDonald, the millionaire

Southern Ohio manager of the Standard Oil Co. until six months ago, when he strangely disappeared, has been located, living in luxury at Bellmore, a town near Windsor, Canada. McDonald claims that Smith's accounts are straight, but that he is insane, and will be brought to a sanitarium here. D. S. Tarbell."

To facilitate the receipt of its dispatches, the plaintiff in error had an arrangement with the telegraph company whereby loops were put in between the latter's main office and the World office, and, instead of dispatches from other cities to the telegraph office being transmitted by messenger, they were switched onto these loop wires, and came direct into the World office, where the telegraph company had employés who took down the messages, which were then delivered to boys, who carried them to the telegraph desk, whence they were distributed to the telegraph editors. The function of the telegraph editor is to read over carefully any dispatch received by him, to correct the English, to eliminate anything which he thinks does any injustice to anybody or anything, or which causes a doubt in the mind of the reader as to the accuracy of the dispatch, and to put headlines on. Thereupon the dispatch is sent to the composing room, and in due course is printed in the paper. The "publisher" of the World testified that the authorized custom in its office is that, unless a dispatch from a distant city "per se raises in the mind of the telegraph editor a suspicion of its accuracy, then he cannot change the facts; and it is optional with him then to judge of the importance of the dispatch, and withhold it from the composing room or have it set up." Where there is nothing on the face of the dispatch which raises a natural doubt as to its accuracy, it goes to the composing room, with its statement of facts substantially unchanged. The dispatch as published in the World of August 18, 1892, was substantially different from the one sent by Gosdorfer. It reads as follows:

"Cincinnati, O. August 17. McDonald, Southern Ohio manager of the Standard Oil Company until six months ago, when he strangely disappeared, has been located living in luxury at Bellmore, near Windsor, Canada."

To this there was prefixed the head-line, "Missing Millionaire McDonald Located." When the case came on for trial the dispatch as written out by the telegraph employé in the World office could not be found, nor was the plaintiff in error able to show which one of its 10 telegraph editors had received it. There was some evidence tending to show that, as thus written out, it was phrased as subsequently published, not as sent from Cincinnati; and it was the theory of the defense that, there being nothing on its face to raise a suspicion of its accuracy, it was sent to the composing room, in accordance with the authorized custom of the paper. That custom required no effort to be made to verify the accuracy of such dispatches, and no such effort was made in this instance.

It was contended by the plaintiff, and evidence in support of that contention was introduced, that the statements touching Evan Smith in Gosdorfer's original dispatch were themselves untrue, a matter which need not be discussed here, since the falsity of the assertions touching McDonald in the dispatch as published is not disputed.

The plaintiff in error contends:

1. That the court erred in denying the motion to direct a verdict for the defendant, and in leaving it to the jury to find whether the publication was a libel. It is insisted that the words of the alleged libel were not ambiguous, and that the court, as matter of law, should have determined that the article was not actionable. Undoubtedly, when the words used are unambiguous, and admit of but one sense, the question whether or not they are libelous is one of law, which the court must decide. Equally true is it that when the words used are "ambiguous in their import, or may permit, in their construction, connection, or application, a doubtful or more than one interpretation, and in some sense be defamatory, the question whether they are such is for the jury." Woodruff v. Bradstreet Co., 116 N. Y. 217, 22 N. E. 354. And the question here presented is the single one: Was the publication so phrased that, taken as a whole, it would fairly permit an interpretation in some sense defamatory, although its separate statements, taken by themselves, contained no improper suggestions? To this, in our opinion, there can be but one answer. It was not necessary for the plaintiff to aver and prove as a matter of fact that there are many American embezzlers in Canada. Nor was it necessary to aver or prove extrinsic facts in order to show that the words were susceptible of a defamatory construction, as it was in Caldwell v. Raymond, 2 Abb. Pr. 193, where the publication was of a simple marriage notice, which could be shown to be defamatory only by proving that the woman named therein was a prostitute. Nor is this a case, as counsel for appellant contends, where the doctrine of judicial notice has been extended beyond its well-recognized boundaries. The meaning of words of common speech, of terms which from continuous use have acquired a definite signification, generally, if not universally, known, has always been judicially recognized by the courts. The meaning or signification thus generally accepted may be one which the word or phrase ought not to be saddled with, but, if such word has acquired that meaning in the community, it is the duty of a court to recognize it. Mr. Beecher may not have been a clerical adulterer, but when the Kalamazoo Publishing Company printed of a clergyman, "Then there was that Iowa Beecher business of his, which beat him out of a station at Grass Lake," it was left to the jury to say whether or not it involved a charge of adultery, for "courts have no right to be ignorant of the meaning of current phrases which everybody else understands." Bailey v. Publishing Co., 40 Mich. 256. So here, although it be the fact (as counsel contends) that no more than ten defaulters ever fled to Canada, and although it is no longer a safe refuge for them, yet the statement that a man of great wealth had strangely disappeared, had secreted himself for six months, and was finally found living in luxury at some small Canadian town, was calculated to suggest to the community in which the libel in this case was published the impression that he had been guilty of some offense against the civil or criminal laws, or of immoral or discreditable conduct.

Tested by the rule for which plaintiff in error contends, viz. that words are to be understood in their plain and natural import, according to the ideas they are calculated to convey to those to whom they are addressed, the publication was plainly susceptible of a defamatory interpretation. The jury had no difficulty in reaching that conclusion, nor do we see any error in the statement contained in the opinion on the demurrer, that such would be the first impression upon reading a paragraph like this. That the publication is calculated to produce precisely that impression was quite curiously made manifest by defendant's own proof. The original dispatch, prepared by the World's correspondent in Cincinnati, contains precisely the same statements of strange disappearance, six months' seclusion, discovery living in luxury in Canada,—all made as to Evan Smith, confidential man for McDonald; and then adds, "McDonald claims that Smith's accounts are straight." Manifestly the writer of this dispatch understood perfectly well that the first part of it would convey the impression that "Smith's accounts were not straight." Inasmuch, therefore, as the publication did permit of an interpretation in some sense defamatory as well as of one entirely harmless, as it admitted of such interpretation without proof of any extrinsic facts, but solely because the language in which it was phrased was calculated to convey such an impression to the community where the libel was published and the court sat, and as the plaintiff by innuendo pointed out the former as being the meaning which defendant intended to convey to its readers, it was properly left to the jury to decide whether or not such publication was libelous.

2. Plaintiff in error insists that the court erred in admitting proof of the plaintiff's social standing, the evidence being, as it contends, introduced "for the purpose of bolstering up the case before the jury [in order that] if the jury should be informed that defendant in error was a man of very high position in the world they could only pay him for his wounded feelings by a verdict out of all proportion to that which would  ·  given to an ordinary citizen." The authorities bearing upon this point are conflicting. The text writers are not in accord. In Massachusetts it was held, as far back as 1807, that the plaintiff in actions for defamation of character may give in evidence, to aggravate the damages, his own rank and condition of life, because the degree of injury the plaintiff may sustain by the defamation may very much depend on his rank and condition in society. Larned v. Buffington, 3 Mass. 546. In Harding v. Brooks, 5 Pick. 247, Chief Justice Parker says:

"The rank and condition of the plaintiff are proper to be made known to a jury by evidence, because the damages may be lawfully affected thereby; but general character has not been the subject of inquiry, unless made necessary by the defense to the action, or to the claim of damages."

In Pennsylvania it was held by Judge Sharswood in Klumph v. Dunn, 66 Pa. St. 147, that:

"The position in life, and the family of the plaintiff, are always important circumstances bearing upon the question of damages, and have always been held admissible for that purpose."

See, also, McAlmont v. McClelland, 14 Serg. & R. 359, where it is said that juries in libel suits always take into view the condition in life of the parties. The point is discussed at considerable length, and the court expressly lays down the proposition that the plaintiff in such actions may give evidence of his own condition in life to aggravate the damages. A similar rule is applied in Connecticut (Bennett v. Hyde, 6 Conn. 24), in Illinois (Peltier v. Mict, 50 Ill. 511), in Virginia (Adams v. Lawson, 17 Grat. 250), and Kentucky (Eastland v. Caldwell, 4 Am. Dec. 668). See, also, Shroyer v. Miller, 3 W. Va. 161; Fowler v. Chichester, 26 Ohio St. 9. A decision in Indiana, where the question raised was as to the admissibility of a question calling for the defendant's position in society, seems to indicate that a similar rule would control there touching such testimony when offered on behalf of the plaintiff. A contrary rule prevails in Alabama. Gandy v. Humphries, 35 Ala. 617. The point does not seem to have been presented either to the supreme court of the United States or to any of the circuit courts of appeal. In Romayne v. Duane, 3 Wash. C. C. 246, Fed. Cas. No. 12,028, the court decided in a libel suit that, character being put in issue, the plaintiff might give evidence of his character before the defendants had attacked him. In Wright v. Schroeder, 2 Curt. 548, Fed. Cas. No. 18,091, Judge Curtis held that, while the defendant may offer evidence of the plaintiff's bad reputation to reduce the damages, the plaintiff may not introduce evidence of his previous good character, in chief, before any attack upon his character; although the learned judge admits that there are authorities to the contrary. The two cases last cited, it will be observed, deal not with standing in society, but rather with general good character and reputation morally. The plaintiff in error cites the case of Prescott v. Tousey, decided in 1884, by the general term of the New York superior court, Judge Sedgwick dissenting (50 N. Y. Super. Ct. 12). The prevailing opinion in that case does undoubtedly hold that it was error to receive evidence of the plaintiff's social position and standing in society. The learned judge who wrote the opinion, however, seems to have reached his conclusion through a misconception of some of the earlier decisions in this state. He cites Hatfield v. Lasher, 81 N. Y. 246, as authority for the proposition that evidence of the plaintiff's bad reputation is not admissible for the purpose of showing that his reputation was so bad that defendant's libel could not injure him, and proceeds with perfectly sound logic:

"If defendant cannot prove plaintiff's bad reputation to decrease damages, why should plaintiff be allowed to show his good reputation for the purpose of increasing them? And, if plaintiff cannot show his good reputation, why should he be allowed to show his standing in society, especially since the laws of this state do not recognize different ranks in society?"

Turning to Hatfield v. Lasher, 81 N. Y. 246, we find that the precise point was not involved, although a dictum of Chief Justice Folger, who writes the opinion, apparently goes to the full extent of the doctrine enunciated in the superior court. The chief justice says of the proposition that "a person of disparaged fame is not entitled to the same measure of damages as one whose character is

unblemished, [a fact which] it is competent to show by proof," "such is not the rule in this state." In support of this proposition he cites Root v. King, 7 Cow. 629, and Gilman v. Lowell, 8 Wend. 579. Neither of these cases at all supports the proposition for which it is cited. In the earlier of them, Chief Justice Savage, writing the opinion, cites Larned v. Buffington, 3 Mass. 546; refers to the English rule that the defendant may give evidence of plaintiff's general bad character in mitigation of damages; states that the same rule prevails here, upon the ground that a person of disparaged fame is not entitled to the same measure of damages as another whose character is unblemished; and adds that under any circumstances defendant may show that the plaintiff's reputation has sustained no injury, because he had no reputation to lose. In the other case cited by Chief Justice Folger, namely, Gilman v. Lowell, 8 Wend. 573, the court says:

"Whether the plaintiff's rank and condition in life may be shown either to enhance or diminish the damages, it is unnecessary now to decide; and it is not perceived that this principle has any connection with malice [which was the precise point before the court]. It is proper under the head of inquiry into general character. Persons in different stations would be differently damnified by the same slanders."

In Foot v. Tracy, 1 Johns. 52, Kent, C. J., says:

"In assessing damages the jury must take into consideration the general character, the standing, and estimation of plaintiff in society; for it will not be pretended that every plaintiff is entitled to an equal sum for the worth of character. The jury have, and must inevitably have, a very large and liberal discretion in apportioning damages to the rank, condition, and character of the plaintiff; and they must have evidence touching that condition and character, so as to have some guide to their discretion."

In Palmer v. Haskins, 28 Barb. 95, Marvin, J., says:

"That the general standing in society of either of the parties may be proved I have no doubt."

Other cases in the same state which may be referred to are Fry v. Bennett, 4 Duer, 262; Hamer v. McFarlin, 4 Denio, 509; Inman v. Foster, 8 Wend. 602.

We are of opinion that the weight of authority is clearly in support of the proposition that the condition in life of the plaintiff may properly be given in evidence in chief to aggravate damages. Of course, if some peculiar and special damage is claimed, it should be specially pleaded. While it is true that plaintiff's character and reputation morally are presumed to be good, and therefore need not be proved by him to be such unless attacked, there seems no sound reason for holding that he may not prove his station in society as part of his testimony in chief, in view of the statement in Gilman v. Lowell, which (despite the decision in Prescott v. Tousey) is still the law of this state, that "persons in different stations would be differently damnified by the same slander." In some respects, the evidence on this branch of the case at bar, went more into detail than in any of the cases above cited. Whether this was error, and, if so, whether it was harmful error, we need not discuss at length, in view of the disposition to be made of the case. It is sufficient to say that, when a plaintiff offers to prove his social standing to increase dam-

ages, the testimony admitted should be confined to his general social standing, and not extended to minute details of his life.

3. The plaintiff in error further contends that the instructions of the court as to the question of express malice were erroneous, and that the charge to the jury should have been corrected in accordance with his requests. Upon this branch of the case the court, after defining punitory damages, charged the jury that:

"In this case it is not shown that the defendant had any knowledge of, or animosity against, the plaintiff. It did not publish the libel for the purpose of injuring him, and therefore there is no claim that express malice can be shown by any direct intention to injure the plaintiff. But it is claimed, and it is true, that express malice may also be shown by a reckless and wanton carelessness, * * * a wanton neglect to ascertain the truth [of the publication], when means of accurate knowledge are readily attainable. A reckless lack of knowledge or care to know whether a grave imputation of crime or criminal conduct is true or false, and the absence of precautions taken to obtain knowledge of the truth of a charge of criminality against a person in regard to whom accuracy was obviously easily attainable, may be adduced to show what the law terms 'express malice.'"

The court next reviewed the theories of plaintiff and defendant upon the question whether the facts in proof did or did not show such reckless carelessness or wanton neglect, and further charged:

"The question whether any punitory damages are to be given depends upon your conclusion whether the publication was made with recklessness, and with a wanton disregard of the question of its truth or falsity. Upon this question the plaintiff takes the burden of proof. If you find in the affirmative, you are not compelled, but are permitted, to give such reasonable and just damages as you think it wise to give to deter like conduct in the future. The amount of vindictive damages is within your discretion, but it is my duty to caution you against excessiveness. You are to be reasonable and just. * * * If you think that sufficient caution was exercised, or if the alleged mistake was a sufficient excuse for the publication, you will not find vindictive damages, or any damages in excess of just compensation to the plaintiff. * * * The real and important question, as it occurs to my mind, is whether the dispatch as published, and upon the theory that it was a mistake, and admitting that it was a mistake, was published with such recklessness and indifference to the truth as justly to charge the defendant with express malice. The defendant is a corporation, and cannot be visited with exemplary damages, although its employés were guilty of express malice in the publication, unless the corporation has authorized the system or conduct, which is the only system relied upon as indicative of express malice in the case, or has subsequently ratified the publication."

This is an accurate presentation of the law as to punitory damages in libel suits. Association v. Rutherford, 2 C. C. A. 354, 51 Fed. 513. They may be awarded not only when the libel has been "conceived in the spirit of mischief," but when it has been published with "criminal indifference to civil obligations." For injuries inflicted "wantonly," as well as for those inflicted "maliciously," exemplary damages may be awarded. Railroad Co. v. Quigley, 21 How. 202. The counsel for plaintiff in error took no exception to the charge as above set forth, but only to the court's refusal to charge two requests of his own, as follows:

"Fifth. There is no evidence in this case that the defendant was influenced by actual or express malice towards the plaintiff in making the publication complained of. Sixth. Express malice is when one with a deliberate mind and formed design commits the act complained of."

In refusing to charge this last proposition the court stated that it "would not limit express malice to that precise language." This was not error. The court had already charged that there was not, in this case, any direct intention to injure the plaintiff, and the request as phrased took no account of that form of malice, well-recognized in cases such as these, where, without "deliberate mind" or "formed design," the offender has been so grossly and recklessly negligent, so wantonly indifferent to another's rights, that he should be required to pay damages in excess of mere compensation as a punishment and example. The refusal to charge the fifth request challenges the right to give exemplary damages upon all the facts of the case. The plaintiff in error cites Railway Co. v. Prentice, 147 U. S. 101, 13 Sup. Ct. 261; Haines v. Schultz, 50 N. J. Law, 481, 14 Atl. 488; and Daily Post Co. v. McArthur, 16 Mich. 447. The first of these is not authority for the proposition that exemplary damages can in no case be recovered against a corporation for the reckless, willful, and malicious act of its agent, the opinion of the supreme court expressly pointing out that in the case before it there was no proof that "the conductor was known to the defendant to be an unsuitable person in any respect." If the injury done to the plaintiff is the result of a rule, custom, or system which is prescribed or maintained by the corporation itself as a part of its regular course of business, and which, with inexcusable recklessness, and in wanton disregard of others' rights, itself promotes the circulation of libels, the corporation may be held responsible, although it was at the time not otherwise a participant in the personal express malice or criminal carelessness of its employé. In Haines v. Schultz, 50 N. J. Law, 484, 14 Atl. 488, the error of the trial judge was held to be "relieving the plaintiff of the burden of proof and transferring it to the defendant," the charge of the trial judge practically leaving it to the jury to assess exemplary damage, unless the defendant adduced proof of his disapproval of the libelous article. And the New Jersey supreme court add: "Had there been any proof of such approval, any testimony of general instructions, of which this libel was the outgrowth,  *  *  *  the jury might have been warranted in inferring a wrongful motive to fit the wrongful act." The discussion of the subject in Daily Post Co. v. McArthur, 16 Mich. 447, is an exhaustive and able one. The Michigan court holds, as did this court in Association v. Rutherford, supra, that the reading public are not entitled to discussions in print upon the character or doings of private persons, except as developed in legal tribunals, or voluntarily subjected to public scrutiny. It reversed the court below, because the charge of the court left it in the power of the jury to hold the defendant corporation "in all respects identified with the faults of its agents;" but it also expressly recognized the principle that, when there is proof tending to show, on the part of the defendant itself, a want of solicitude for the proper conduct of its paper, a recklessness of consequences which dispensed with such precautions as would reasonably prevent an abuse of the columns of the paper, exemplary damages may properly be given. In the case at bar, in addition to the evidence already referred to touching the

authorized system or custom of the paper in publishing statements as to the doings of private persons, it appears that it was perfectly well known to the defendant from actual experience that in the dispatches received over the loop connections from distant cities "errors occur quite frequently," not only from the carelessness of some telegraph operator, but also from grounding or crossing of wires or other natural causes. Telegrams may be repeated, as the defendant's witness expresses it, "to insure safety." This would cost more, and the dispatches received by the World during a single afternoon and evening are so voluminous that, if all were repeated, there would not be time to have them all thus "insured" and still ready to go to press in time for publication on the ensuing morning. It appears further that no dispatches such as the one complained of are repeated, and that the system and rules of the office do not allow that to be done, nor provide any means for the detection or prevention of such errors, except perhaps in those cases where the dispatch is contradictory on its face. The plaintiff thus showed by affirmative proof that (presumably either to save money or to save time) the defendant itself devised and maintained a system of general instructions under which any dispatch from its out of town correspondents, although containing aspersions on the character of private persons, would be published without any effort whatever to ascertain its accuracy, even by the exercise of the ordinary and reasonable degree of care which persons not in the newspaper business are accustomed to employ with dispatches which they esteem important. See, in this connection, Primrose v. Telegraph Co. (May 26, 1894) 14 Sup. Ct. 1098. And it is proved in this case to a demonstration that, had the rules of the World office provided for a repetition of its dispatches, this particular libel on the plaintiff, McDonald, would not have been published; the statements of its correspondent referring not to McDonald, but to Smith. It certainly seems to us that the jury were entitled, upon the evidence, to find in the defendant itself the reckless carelessness and wanton disregard of the rights of others which is required to sustain a verdict for punitory damages. There was no error, therefore, in the court's refusal to charge defendant's two requests.

4. It has seemed desirable to express an opinion upon the points already discussed, although we have reached the conclusion that the judgment must be reversed for error in allowing counsel for defendant in error to read to the jury in extenso the opinion of Judge Wallace overruling the demurrer to the complaint. The rule and the reason for it are alike well expressed in Baker v. City of Madison, 62 Wis. 137, 22 N. W. 141, 583. "The jury must find the facts in any given case from the evidence given to them on the trial, and that alone, and must take the law of the case from the judge who presides at the trial." See, also, Crawford v. Morris, 5 Grat. 103; Bell v. McMaster, 29 Hun, 272; Good v. Mylin, 13 Pa. St. 538; Warren v. Wallis, 42 Tex. 472; Butler v. Slam, 50 Pa. St. 459; and the opinion of the United States court of appeals for the first circuit, Arey v. De Lorica, 5 C. C. A. 116, 55 Fed. 323. Even if it were within the sound discretion of the trial judge to allow counsel to

read opinions of the court to the jury,—as seems to be held in Dempsey v. State, 3 Tex. App. 429; Legg v. Drake, 1 Ohio St. 286,—it was error to allow the reading of the opinion in this particular case, for we cannot say that it may not have influenced the jury in deciding the very question which was submitted to them. Judge Wallace's opinion concludes with the statement that "whether a libelous sense or an innocent sense is to be attributed to the publication [in this case] must be determined by the jury under proper instructions." This part of the opinion was a correct statement of the law, and harmless. The trial judge charged to the same effect. But, although thus stating that the question was one which the jury must decide as a question of fact, Judge Wallace unmistakably indicated that in his opinion "the first impression upon reading a paragraph like this would be that the person referred to had been guilty of some breach of trust," etc. Under the federal system of jurisprudence it is not error for the trial judge to express his opinion upon the facts if he makes it plain to the jury that they must decide all questions of fact independent of his opinion, but neither in principle nor authority is there any sanction for permitting any other person's opinion to be stated or shown to the jury upon such a question, with or without—and especially without—instructions that they were not to be guided by it. Certainly we cannot say that the strong expression of Judge Wallace's opinion as to the sense in which the words of the publication were used (a question of fact) did not operate upon the jury's mind to persuade them to reach the same conclusion.

The judgment of the circuit court is therefore reversed, and the case remanded, with instructions to award a new trial.