GULF, COLORADO & SANTA FE RAILWAY COMPANY v. W. D. BELL.

Decided December 20, 1900.

**1. Injury to Passenger—Act of God—Violent Storm.**

A violent windstorm which drove a freight train standing on the side track back so as to obstruct the main line and cause collision with a passenger train, was not such act of God as to excuse the carrier from liability to a passenger injured thereby; nor, if so considered, would it avail as a defense where the collision might have been prevented by due diligence in flagging the passenger train.

**2. Contributory Negligence—Passenger Standing Up.**

The ruling of the Supreme Court on certified question herein (Railway v. Bell, 93 Texas, 632), that the facts did not require the submission of the issue of contributory negligence on the part of a passenger standing up in the aisle at the time of a collision, followed.

**3. Argument of Counsel—Reading Cases.**

No error appears in the ruling of the court permitting counsel, over objection, to read to the court in this trial in their discussion of the law, but in the presence of the jury. the opinion of the court in Railway v. Brown, 16 Texas Civil Appeals, 93.

**4. Conduct of Counsel—Examination of Witness.**

It was not ground for reversal that counsel in cross-examination, after a question had been held improper, asked other questions subject to the same objection and which were also excluded.

**5. Evidence—Absence of Knowledge by Witness.**

There was no reversible error in permitting a witness to testify that no effort was made to stop the train that he knew of, though he was afterwards shown to have been in no position to know.

**6. Pleading—Matter of Evidence—Rules of Railway.**

Proof of a rule of defendant railway requiring engineers to use extra precautions and run slowly after a heavy rain was admissible without the rule being specially pleaded; it was matter of evidence merely.

**7. Evidence—Opinion—Speed of Train.**

Witnesses forming their opinion from distant sight or from hearing only were properly permitted to testify that a train was running at unusual speed; the objection that they were not in a position to know the fact went to the weight of the evidence only.

**8. Expert Testimony.**

A witness could not testify as an expert that cars in a certain position would appear to be clear of the track; it was not a matter for expert testimony.

**9. Damages—$10,000 for Personal Injury, Sustained.**

See court's findings of fact for testimony held sufficient to sustain a verdict for $10,000 for personal injury to a passenger in a railway collision.

**10. Practice—Statement by Counsel of Facts Expected to Be Proved.**

It was not ground for reversal that plaintiff's counsel, in the examination of witnesses, in answer to a question of the court, stated certain things which they expected to prove, but did not,—the jury being instructed to disregard such statement.

**11. Argument of Counsel.**

No ground for reversal appears from the fact that appellee's counsel, in argument, referred to certain witnesses as good men, or well known citizens, or known to the jury.

**12. Same.**

Argument of counsel not excepted to is not ground for a new trial or assignment of error.

**13. Evidence—Personal Injury—Declarations of Pain.**

A witness may testify to declarations of a party as to present physical suffering; they are a part of the res gestae and it is for the jury to decide whether the complainant was malingering.

**14. Damages—Value of Time Lost.**

On the question of damages a plaintiff may testify as to what, in his opinion, his time would have been worth in his business (that of a trader in cattle) if he had not been disabled.

**15. Cross-Examination—Relations of Witness with Party.**

It was allowable in cross-examination of a medical witness to bring out the fact that he had formerly been employed as local surgeon for the defendant railway company introducing his testimony.

**16. Depositions—Time of Filing—Surprise.**

A party is not required to file depositions in possession of his counsel, received from the hands of the notary, before the trial begins, but may, it seems, withhold them till the necessity for their use develops on the trial. Nor did the production of such deposition on the trial justify a continuance on the ground of surprise.

**17. Depositions—Evasive Answer.**

See answers of witness (in statement by Reporter) held not to be evasive of the questions.

**18. Damages.**

As bearing on the question of damages from loss of time in his business (a trader in cattle) by personal injuries preventing him from pursuing it, plaintiff could testify that at the time of his injury he had made arrangements to secure the money to conduct it.

**19. Expert Evidence—Physician—Reasonableness of Testimony.**

A medical expert will not be permitted to review the testimony of a plaintiff

as to his personal injuries and sufferings and give his opinion thereon as to its reasonableness or correctness.

**20. Impeachment of Witness—Rebuttal.**

A witness whose character it is sought to impeach, is not confined, in his rebuttal, to testimony as to reputation during the same period of time as that to which the impeaching evidence was addressed.

**21. Damages—Medical Expenses—Charge.**

Where the charge instructed the jury to allow as damages only such medical bills incurred as were shown to be reasonable and necessary, an instruction to allow none was properly refused where there was evidence of the reasonableness of some of those proved.

Appeal from Coleman.   Tried below before Hon. J. O. Woodward.

On cross-examination of Ricks, a witness for defendant and engineer of the passenger train, he was asked: "How many collisions have you had?" On objection, the question was ruled out. Counsel then asked: "How many collisions have you had on the Santa Fe road?" and "How many deaths have followed by reason of collisions had by you while on the Santa Fe road?" Both these questions were excluded, on objection, and defendant reserved a bill of exceptions to the conduct of counsel in asking them after the first ruling.

The witness Collins, who testified that he thought the train was running unusually fast, was 250 yards away at the time, and was in bed. Witness Key, who testified similarly, saw it from a distance of 400 yards.

Witness McDaniel, in his depositions (sought to be quashed because certain answers were evasive), had testified, in answer to questions as to plaintiff's reputation for veracity, substantially, that he had heard no complaint except of his failure to pay his debts during the past few years, and in answer to a subsequent question as to details of these complaints, had stated that he thought it improper to give them.

The evidence of plaintiff, admission of which is complained of in the thirty-seventh assignment, was as follows: "At the time of the injury I operated with what few cattle I had, and borrowed money and bought and sold cattle in that way. When I came here I had arrangements made with Jim Daugherty and Lowden at home for what money I needed to buy cattle and I was to have a half interest in it. That was J. G. Lowden who testified here by deposition. The matter was perfected at their bank up here in Abilene."

The objection of defendant to the rebutting evidence offered to sustain plaintiff's character was, that the same was not confined to reputation at the same period of time as that of the witnesses testifying in impeachment; that is, at the time he testified.

The verdict assessed plaintiff's damages at $10,000.

*Sims & Snodgrass, J. W. Terry,* and *Chas. K. Lee,* for appellant.

*Cockrell & Hardwicke, J. K. Baker,* and *Theodore Mack,* for appellee.

COLLARD, ASSOCIATE JUSTICE.—This suit was brought by W. D. Bell against the Gulf, Colorado & Santa Fe Railway Company, to recover damages for injuries received while a passenger on appellant's passenger train going into Coleman from Brownwood on the night of the 15th day of May, 1895. The trial resulted in a verdict and judgment for plaintiff, from which defendant has appealed.

We have considered and overruled the motion of appellee to strike out the statement of facts.

*Findings of Fact.*—We find the facts as follows: Plaintiff was a passenger on defendant's passenger train from Brownwood to Coleman. There had been a severe storm of wind and rain at Coleman that had driven a train of stock cars standing on a switch at Coleman back on the main track, so that the end of the rear car of the stock train projected over on the main track, making an obstruction to passing trains. The brakes had been turned on the freight train to keep it in position on the switch, but the track inclining with the direction of the wind, the cars were moved as stated. An employe of the company had discovered the position of the stock cars, and by direction of the company's agent, immediately after the discovery, went out with a lantern to flag the passenger train, then in view coming in from Brownwood after the storm, plaintiff being a passenger thereon, riding in the chair car.

The employe sent out to flag the passenger train proceeded about 450 yards from the depot, passing the obstructing cars, and was opposite his home when his lantern went out, so that he could not give the signal of danger. He hurried back to the depot and "fixed" his lantern and started back to flag the train, and when he arrived at the switch his lantern went out again, and he had not time to relight it. The wind was then blowing very little. He did not know what caused his lantern to go out. He "commenced hollering" and ran down to meet the passenger train; saw he could not stop the train, and got off the track. The passenger train ran into the stock car. Plaintiff was asleep, and just before the collision the conductor woke him up, saying, "We are at Coleman." Plaintiff raised up and was standing in the aisle at the time of the collision, and was thrown against the smoking compartment in the front end of the chair car. When he got up he was standing in the aisle some eight or ten feet from the smoking compartment at the time of the collision.

We incorporate the following statements of witnesses as facts proved on the trial, and find that the facts stated are true; and we also find that the physical conditions of plaintiff, stated, were caused by the collision of the cars, which collision was the result of negligence on the part of defendant company.

Speaking of the collision, plaintiff testified: "I think it jarred the car I was in considerably, threw several persons down, and it threw me against the wall of that room [the smoking compartment]. I struck the wall on the left side of my head and left side. My head

struck the wall, and my shoulder, and I reckon my hand and arm, and my leg struck something,—I suppose the bench that was in front. It was my left leg. After that I went to the hotel in Coleman that night. The blow seemed to deaden my leg. It mashed it right there on my shin. It seemed like you could lay your finger in the bruise. I had my watch in my vest pocket at the time, and it mashed the case and broke the crystal and hands. Prior to that time I was in good health,—lived a pretty active life, was never sick but once in my life that I remember of; that is to say sick. Of course, I have had bad colds, but was never sick, except with the measles to go to bed. Striking that compartment seemed to numb me at the time, and there was soreness in my head and shoulder and leg. My leg was the worst first, it seemed, the next day, and kept getting worse. It seemed to be two or three weeks before my head got to feeling bad. It was aching and throbbing all the time and just kept getting worse until it ran, and I had it operated on. I stayed at Coleman the following day, and went to Fort Worth on the 17th of May, the second day after I was hurt. When I got to Fort Worth I went to see Dr. McCoy. He treated me. He ripped my drawers off my leg and bound it with a bandage and iodoform; he did that for about twelve or thirteen days once a day, and I believe twice some days. After that went home to Abilene.  *  *  * Stayed at home eight, ten, or twelve, or maybe fifteen days, then went back to Fort Worth to have my head treated. My head was all swollen up and hurting,—swollen up from the center of my head down to my shoulder, all the side of my face. I went to Dr. McCoy the first man after I got to Fort Worth. He did not treat me or do anything for my head; he said he was not a specialist in that business, and said he would send me to Dr. Gray, who was the best specialist in Fort Worth. Dr. Gray treated me about a month. He examined my head and took his instruments and examined through the ear, and doctored me, and operated on it in some way. I don't know what he did, but he worked every day while I was there. After that I went back home and stayed at home a good while before I went back to Gray. It rose again after that. I think I went to Gray two or three times, and maybe four. I was sick for two years, off and on, after I returned from Gray. Was mostly in the house; a good part of the time I was not able to be up. The trouble seemed to start from my head, and the muscles of my shoulders and the side of my back would swell up and I would have to bathe them and use cupping glasses and such things as that.  *  *  * My head swelled up frequently. I don't know how many attacks of the head I have had,—a good many, a dozen I expect, maybe more. I have never, since the accident, felt stout and well and hearty like I used to be,—have never been able to do the work that I did. I can not do any hard work at all; it always lays me up,—hurts my back. I can not ride horseback,—can not jar. I can not go out in the heat of the sun at all. It causes my head to pain me and throws me into a fever. *  *  * There was never anything the matter with my ear before this

accident. Now I can not hear out of my left ear scarcely at all. I can hear a noise, but can not distinguish sounds or anything like that. I do not believe, really, I have ever been free from hurting since I received this injury. I have hurt more at some times than at others. A great many times I have suffered a good deal,—maybe for a week or two weeks and maybe longer, and then I would get over it; but to be free from hurt, I do not believe I have ever been since I was hurt.   *   *   * Horseback riding hurts me in the spine, right on the left hip. It hurts my head and under my left shoulder. As far as my walking, for a long time I could not walk. I would hurt up my leg. It was weak for a long time; it still hurts me some now, but not all the time."

J. N. Furgeson testified as follows, and we find his statements are true: "My name is J. N. Furgeson; age 41; my occupation a cattleman. My residence is Abilene, Texas, where I have resided for the past four years. I am acquainted with the plaintiff W. D. Bell. I have known him some ten or twelve years in Taylor and adjoining counties. I have known him right well during these years; have traded with him; seen him work around with cattle; have talked with him and been thrown with him off and on all these years; I did observe his condition. Prior to his accident on the railroad, or alleged accident, he was a stout, strong, healthy, and vigorous man. He moved about like a man in perfect health, and if there was anything at all the matter with him in any way, there was nothing in sight to show it or indicate it. Ever since that accident he has every appearance of a man in bad physical condition; moves about in a slow, sluggish way; he uses a stick and was limping about. Before his accident he rode horseback a great deal. I can not recall ever having seen him on horseback since the time of this accident. I noticed after his accident that his hearing was affected and he had cotton in his ears. Prior to his accident he was almost constantly on the go, trading in cattle, but since the time of that accident he has not done anything. It is possible the plaintiff could have been affected with ear trouble prior to May, 1895, and the same not known to me, but it would have to be not very serious. I never examined him myself nor saw a doctor examine him prior to May, 1895. Prior to his accident I made no further inquiry into his health or condition than to make the usual and customary inquiry as to how he felt, or how he was getting along, or how he did. Since said accident I have made it a point to inquire into his condition whenever opportunity occurred. I make the same answer as to possibility of plaintiff having had catarrh of the head or nose prior to May, 1895, that I made to the possibility of his having ear trouble. The only way I would have of not knowing that he had or did not have a disease was or would be by seeing him and noticing him and noticing his motions and hearing him complain, or notice that he did not complain, and to observe how he got about and did generally. This is about all I can say as to this. I can not tell without in some manner or some way making an examination that he

has or has not any disease; I could not tell by simply seeing a person going around or general appearance."

W. A. Minter testified as follows, and in deference to the verdict we find his testimony to be true: "I am 69 years old. I am a justice of the peace of precinct No. 1, Taylor County. I live at Abilene, and have so resided since 1883. I am acquainted with plaintiff; have known him at Abilene since 1883. During the first part of my residence at Abilene Mr. Bell was my neighbor; he lived just across the street from me, and he is a man of social turn, and we got well acquainted then. After he moved from across the street, the fact of his having been my near neighbor during the time stated made me feel a deeper interest in him than I ordinarily would have felt, and hence since that time I have kept up with him closely, and in going back and forth through town, and on the streets, and in the business houses, and in a social way, I have been meeting him and talking with him frequently ever since. I did notice his condition during all of said time. To my certain knowledge prior to his accident on the railroad in May, 1895, Mr. Bell was a stout, strong, and healthy man, in the prime of life, and of a vigorous manhood. Some time after the accident I saw him down town, after he had gotten up and out on the streets. I saw him then and I noticed that he was lame and had his head tied up. I talked with him, and many times thereafter inquired as to his health. He was thin and weak and he showed signs of suffering. Since that time his apparent health has been bad. I was engaged in the drug business in Abilene in 1883, 1884, and part of 1885, I think. I was intimately acquainted with Dr. I. C. McCoy. He officed in my drugstore at the time stated above. I know Dr. Barry, a resident physician of Abilene, was plaintiff's family physician at that time. I know that Dr. Barry was his family physician, for Mr. Bell was my neighbor, and he and Dr. Barry, I know, were intimate friends and in fact were partners in the livery business, and I was also intimately acquainted with Dr. Barry. According to my best recollection, Dr. McCoy never had any professional relation with plaintiff or his family, and I feel sure, if he had attended plaintiff's family as a physician during 1883, 1884, or 1885, or had attended on plaintiff, I would have known it, as he officed in my drugstore. I knew the families that he practiced in, and I do know that Dr. McCoy was not plaintiff's physician. From my intimate association with plaintiff during 1883, 1884, and 1885, I should say he had no ear trouble. I never heard him make any complaint of any such trouble. It might have been possible for plaintiff to have been slightly affected with ear trouble prior to May, 1895, and I not know it. He could not have had much the matter with him and I not know it. Prior to May, 1895, I never examined Mr. Bell myself and I never saw a physician examine him. As a neighbor, I was constantly inquiring of him and his family, as to his and their health, and prior to this accident, as to Mr. Bell, the uniform answer was that he was well. Since his accident I have made uniform inquiry into his health. Plaintiff might possibly have had a very slight attack of catarrh

of the head or nose, prior to May, 1895, but nothing serious, for I was with him so frequently and knew him intimately. I could know he was not so affected by seeing and talking with him. I can not tell about these affections without examination, unless I should be with the person a good deal. Unless he were seriously afflicted, I could not tell by seeing the person going around or by his general appearance. From my best knowledge he was not 'busted' or insolvent prior to May, 1895. His 'busted' and insolvent condition dates from the time of his said accident."

D. L. Middleton testified as follows, and we find his statements as true: "I am 62 years old; am a stock raiser; have resided in Abilene since 1883; have known the plaintiff since 1884. Have been with him in almost every way; have been with him on the range; worked with him there; ridden over the country with him; been on the trains with him; been with him in the cattle pens, and associated with him intimately; seen him constantly on the streets and in the business houses and talked with him, and from this constant and intimate association with him I have had my opportunities to observe his condition since I have known him, and I have observed his condition. Up to the time of his accident on the railroad,—that is, May, 1895,—his health was good. He always appeared to be a stout, healthy, active man, so far as I could observe, in every way. Since said accident, that is, since May, 1895, I have had the same opportunities for observing him, except that since he has, so far as I know or have observed, stopped horseback riding, and I have therefore not seen much of him on the range, or running with cattle or working around with them. His condition since has been bad. He was lame, using a stick to walk with. He since said time gets around slowly and does not appear to be active and vigorous, as he used to be prior to said time. It is possible plaintiff could have been slightly affected with ear trouble prior to May, 1895, and I not discover it, but if it had amounted to much I would have discovered it, intimately associated with him as I was. I never did examine plaintiff myself, and never saw him examined by a doctor prior to said May, 1895, and made no further efforts to learn of his health than I would of others with whom I associated as intimately as I did with him. He always appeared to be well, and I saw nothing to cause me to make any special inquiry into the condition of his health. It is possible that plaintiff might have had and been afflicted with catarrh of the head or nose prior to May, 1895, and not know of it, but it would have had to be very slight for me not to have observed it at some time prior to May, 1895, and I never did observe such trouble prior to May, 1895. I could not tell a trouble of that kind by simply seeing a person on the streets or from general appearance, but if I am thrown with a person as I have been with Bell, both before and since said accident, I can always tell whether they are so affected or not. Just in the same way I very promptly discovered after said accident that there was trouble with Bell, by exactly the same sort of intimate association with him since said accident as I

had with him before said accident. I could tell there was such trouble
since, while there was none before. Prior to May, 1895, I have made
purchases from plaintiff, buying as high as 1600 head of cattle under one
contract. Since said May, 1895, I have never bought any cattle from
him. From what I have seen myself and heard through and from him,
he has appeared to be 'hard run' since that time. Further than this, I
can not say about his financial condition before and since said time."

R. G. Anderson testified truthfully as follows: "Am 41 years old;
reside at Abilene, Texas, and have so resided since 1883. Am a grocery
merchant. I am acquainted with plaintiff; have known him ever since
shortly after I came here. My opportunities for knowing him have been
in two ways, one in a business way and the other socially. I have con-
stantly seen him, off and on, all this time; been with him, traded with
him, talked with him in a business way and socially, more or less con-
stantly during all these years. I did observe his condition. I always
considered him a very healthy man prior to the time of his accident
on the railroad. He moved like a well man and acted as a perfectly
healthy man prior to that time. Shortly after the accident and
his return to Abilene, I went up to see Mr. Bell at his home. I
found him in a very bad fix and suffering intensely. He seemed
to be suffering so much, I did not think it best to talk to him a
great deal, and did not do so. His principal trouble was his head,
and the man's whole actions and his face showed that he was suffer-
ing very much. His sufferings were then intense. This was addi-
tional opportunity I had of examining him and seeing his condition.
When I went to see him again, he was not suffering so much, having
been somewhat relieved of his sufferings by a physician, but he was still
suffering. In the course of time I saw him out and walking around on
the streets with cotton stuffed in his ears. He has ever since been slug-
gish and slow in his movements and seems to lack vitality. For a long
time he was apparently crippled and lame, and used a stick to assist him
in getting about. This latter condition of inactivity and sluggishness
still continues to this present time to a great degree, and he now seems
to have lost all life and ambition. If plaintiff had had a very slight affec-
tion of the ear prior to May, 1895, about which he never spoke or com-
plained, I might not have known of it, but it would have had to be very
slight and him not complain or talk about it. I didn't examine him my-
self, nor did I ever see him examined by a physician prior to May, 1895.
I have already stated that since said accident I did inform myself of his
condition, but prior to that time I did not do so. It does not seem
hardly possible for plaintiff to have had anything much the matter with
him (as to having catarrh of the head or nose prior to May, 1895) and
me not find it out, for I was with him so much; but as I have already
stated, such a thing might be possible. In answer to, 'If not, why not?'
all I have to say is that I never knew of a man's having much the mat-
ter with himself, if he himself was conscious of it or was suffering with
it, that he either did not show it in some way by his actions or say some-

thing about it, and I was intimate with Bell during all of this time up to the time of his accident. I did not see anything to indicate any trouble of any sort, and he did not say anything about having any trouble of any sort. But after the accident, anybody who was with him much and saw his movements and his actions and heard him talk much, would soon find out that there was something the matter with him. He was lame, walking slowly about with a stick, with marks of suffering on his face and with cotton stuffed in his ears, and with his hearing very decidedly impaired. I would know he was not so affected by his actions and his talk and his looks. I could not tell from seeing a person walking along casually or from his general appearance that there was anything the matter with him as to having catarrh of the head or nose, or any head or ear trouble, at least if he was only slightly known to me. In the way stated, I think I could always tell if there was anything the matter with a person. The only way I can answer as to his financial condition is to say that he has traded with me off and on for all these years, and he has kept his accounts pretty well paid up until after this accident occurred. Since then he has been slow pay."

Ira Border testified as follows, and we find the facts stated by him are true: "My residence is now and for the past eighteen years has been at Abilene, Texas. Am 42 years old; am a merchant. I am acquainted with plaintiff. I have known him ever since he has been at Abilene. Have had more or less business transactions with him ever since he has been at Abilene. I have been out with him on the range, bought cattle from him, have ridden in the country and about with him, seen him on the streets constantly, associated with him almost constantly, and thus had every opportunity of seeing him and his condition in every way, and I have noticed his condition as to strength, health, and illness. Up to the time he claimed to be hurt on the train he always appeared to be well and hearty, and associated with him as I was, if there had been anything the matter with him prior to that time, I certainly would have known it, but there was nothing the matter with him prior to the time of the accident above referred to. Since said time I have noticed him, and he has always appeared in pretty bad shape. While talking to me, I have frequently since said accident noticed matter running out of his ear and told him to wipe it off. I have noticed, too, that since said accident his hearing has grown bad. He also seems to be disabled in one leg and walks with a cane. Since said accident he gets about much more slowly than he used to before that, and generally has the appearance of a man in bad health. It is possible, I suppose, for him to have been slightly affected with his ear prior to 1895 and I not know it, but it would have been mighty slight, for I was thrown with him so much in so many different ways that it would not have been probable for him to have been afflicted in any way and I not know it. Prior to May, 1895, I never did examine him and never saw him examined by a doctor. It might have been possible for plaintiff to have been slightly affected with catarrh of the head or nose prior to May,

1895, and I not know it, but I certainly could have told it and would have noticed it if he had had any such affliction. He never said anything about it and never complained of it, and I never saw anything in any way indicating it prior to said accident, but since then his complaints and afflictions are very noticeable, and a man don't have to examine him or see a doctor examine to tell it. I could tell that he was not affected prior to said accident in much the same way I could tell he was affected since said accident, by being with him, riding around with him, talking with him and watching him generally, as any person will observe another with whom he associates in business life. If I am thrown with any person as closely as I have been with Bell, I can tell without examination if he has catarrh of the head or nose, or any ear trouble to amount to anything. Simply seeing a person, such as a casual acquaintance going around, or by his general appearance only, I could not tell whether he was so afflicted or not; but let me ride around with him on the range and brand cattle with him, and be intimately and constantly associated with him as I have been with Bell, and I undertake to say I can tell if there is anything much the matter with him. I can speak of his financial condition only in a general way; he always appeared to have something prior to said May, 1895. I have frequently bought considerable cattle from him, Don Bell himself making me the bill of sale, but since said time I have made no such purchases from him. Before said accident he paid his debts, but since said accident he has become slow pay."

J. G. Lowdon testified as follows, and we find his statements are true: "My age is 42; I am a banker by occupation. I live at Abilene, Texas, and have so resided since 1885. I am acquainted with the plaintiff. I have known him at Abilene ever since I went there. He was my neighbor for a number of years, living next door to me, and in that way I became acquainted with his condition. I have also met him in the usual business way, seeing him in the bank frequently and on the streets and around town, just as we are in the habit of meeting acquaintances and neighbors from time to time. He passed my house in going to town, and being of a social nature he would stop and talk with us, and frequently we would go down town together. I did observe his physical condition. Prior to his accident on the railway in May, 1895, he was, as far as I could observe, a perfectly strong, healthy man. I never knew or heard of his being sick in any way. After his injury I know that he was confined to his bed and was a very sick man. My family did what we could for him at that time in nursing him and looking after his little children, his wife being dead. And it was also in this way that I became more thoroughly acquainted with his condition. He was then quite a sick man, suffering much pain. After he was well enough to be up and around, he even then looked bad. He was thin and emaciated and weak, and showed every mark of much physical suffering. After that he had other attacks which were more or less severe, and at times he was very low, while he was a neighbor of mine. He afterwards recovered suffi-

ciently-to get out and on the streets, but he limped along, using a walking cane to assist himself, and I noticed that he had cotton in his ears. His face showed clearly the marks of great physical suffering, which were easily observable. Ever since then he has been sick and mopes around. His eye has lost its brightness, and he is and ever since has been slow of motion and apparently wanting in energy and spirit. Before this accident he was lively and active, one of the most energetic traders I ever knew. His eyes were bright and his motions were those of a man full of life, energy, and activity. My opportunities for knowing his condition are stated above. I can not say as to his financial condition other than that he was a frequent and active trader prior to his accident, but since then I know of no attempt scarcely of his to make a trade. He seems to have lost all vitality. His financial downfall dates from the time of the accident on the railroad. Prior to that time he was not 'busted' or insolvent. At the time of the accident he had perfected arrangements for quite an extensive deal, involving large sums of money, and the result of the accident and the disability following it prevents him from carrying out the arrangements, and from that time his financial downfall dates. Such a thing as the plaintiff having ear trouble prior to May, 1895, and I not knowing of it,—it is possible, but not probable. It would have been certainly a very slight attack. I never did examine Bell myself and I never saw any physician examine him prior to May, 1895, nor did I, prior to said May, 1895, inquire about or try to learn of or inform myself concerning his health, but I have made inquiry since then from time to time. Such a thing as plaintiff having catarrh of the head or nose prior to May, 1895, without my knowing it, might be possible, but not at all probable, and the attack must have been a very slight one. I could know he was not affected within reason, if I were well and intimately acquainted with him, as I was and am in this instance, and never saw anything to indicate such disease, and never heard him in any way make complaint about it. I never did see anything to indicate that plaintiff was so affected, and never heard him say anything about being so affected, until after his accident. Since then he was affected with his head; it is apparent, and he shows it. One can tell without an examination in some instances that a person has or has not a disease. His deafness I discover without an examination. I can also tell catarrh, where a bad case, without any examination, but I do not assume to say that I could tell the cause of either catarrh or deafness either without or with an examination. I could not tell by seeing the person going around or by general appearance."

Mrs. Mary A. Jackson testified as follows, and we find her statements are true: "My residence is Abilene, Texas. Plaintiff is my father. I have resided at Abilene, Texas, since 1882. I lived with my father at his house in Abilene until May, 1896, at which time I married. Since my marriage I have kept my own house. During all of that time I have lived in Abilene, Texas. I know the condition of my father's health

during and since the year 1882. I know because of my relationship to him, living in the same house with him up to 1896, seeing him walk, act, and eat during all that time, and knowing when he was sick and when he was well; since 1896 I know, because of his being at my house and my being at his house. From 1882, as well as from my earliest recollection to the time of the accident, my father was a strong, healthful, robust man, never being more than slightly indisposed. The only complaint or illness he suffered from was a severe boil on the neck, and this was in 1891. With that exception he was free from complaint or disease of all kinds and led an energetic and active life. With the exception of having the physician to have the boil mentioned lanced, I never knew of him requiring or having a physician until after the time of the accident in question. When my father returned home after the accident in question, he was crippled and was a very sick man. He was then suffering in his spine, hip, head, and ear especially. Ever since then he has been sick. His ear from that time has been affected, and frequently the entire side of his head was swollen for days at a time, and he would obtain no relief until the ear ran, and it discharged a most offensive matter. After this discharge the swelling goes down, and he is then easy with his head until another attack with his ear comes on. This condition has continued ever since his return home after the accident. Some of these attacks are worse than others and continue longer. Last spring he was confined to his bed about five weeks with his ear. The symptoms at that time were as above described. Ever since then he has been compelled to use liniments on his ear, back, and hips. At no time since such accident has he been strong. He has been weak and sickly all the time. His ear or head trouble has continued all the time. At times it will swell and be very bad for a week, and at another time for as much as two weeks, and as before stated it continued one time for five weeks at a time. During these attacks he would have to be nursed and cared for until the ear discharged. These attacks have been frequent. I can not give the dates of each of them, but they have continued, with short intermissions, ever since the accident. His present condition as to his health is very bad. Ever since the accident in question his health has been very bad and very seriously impaired. Before that he was strong and healthy. Since then he has been weak and sick; his back and hip troubles have crippled him, and he has been unable to get about as he formerly did; has been unable to do the heavy work about the place as he used to do; for a good part of the time he has been kept in his bed, unable to do anything at all. His head and ear have bothered him, as stated above. His said trouble also rendered him exceedingly restless, and much disturbed him during the night, as well as during the day. His sleep has been disturbed, and frequently and at all hours of the night his ear troubles would cause him to cry out, and we would have to get up and poultice his ears, and wait upon him and nurse him. Before this accident he usually traveled horseback, but since then he has been unable to ride horseback. Formerly he could stand exposure to the

sun, but now he can not, as the heat of the sun affects his head and makes him sick. His ability to work has been seriously impaired and his health is apparently ruined. He has lost much of his energy, having up to the time of the accident led a very active, energetic life, and since the accident he has lost so much of that. Before the accident he was of a happy and jovial disposition, and since then he has been morose and gloomy. His sufferings at times have been intense. I know who my father's family physicians have been ever since 1882. Up to 1889, Dr. Will Barry was such physician. Whenever we chanced to need a physician in Dr. Barry's absence we went for Dr. Blakemore. Dr. Barry died in 1889, and for a few months after that Dr. Blakemore was our regular family physician. Dr. Blakemore moved to the country, and we then got Dr. L. A. Grizzard to take his place as our family physician, and he has been my father's family physician ever since. At one time, while Dr. I. C. McCoy was living at Abilene, my aunt, who was Mrs. Dug Wood, was very sick out at her home in the country about twelve miles from town, which terminated in her death. Dr. Barry and his wife and Dr. Blakemore and my mother were with my aunt at her bedside, during which time one of my sisters was sick, and some members of the family called in Dr. McCoy. He came and prescribed for her. This was the only time Dr. McCoy was ever at our house, and his social and professional relations with our family began and ended with that visit. I know these facts, because I was present at my father's house all the time. My mother and all of the children frequently required a physician, and I know who the physicians were by seeing them come to our house to prescribe for mother and the children, and they frequently prescribed for me. I know who the physicians were who waited on my mother in her last illness. I was with plaintiff all my life as a member of his family up to 1896, since which time he has stayed part of the time at my house and I have frequently been at his house. Since my marriage my home has been about four blocks from his house. The degree of intimacy has been such as exists between father and daughter, with the addition that in this instance my sisters and I have been my father's housekeepers from the time of the death of our mother."

*Opinion.*—We do not think the evidence shows that the verdict is unwarranted, as claimed in the first assignment of error, which claims that the injury was caused by the act of God. Even if the storm which drove the freight train back on the main track was of such a character as to be the act of God, yet it is shown that if the incoming passenger train had been flagged, as might have been done by the exercise of proper diligence, the collision would have been avoided. Nor do we believe that the storm was of that character as to be denominated the act of God, in the sense that defendant would be excused under the circumstances, even had diligence been used in flagging the passenger train.

It has been decided by the Supreme Court that the testimony did not

require a charge upon contributory negligence, and hence the assignments of error complaining of the refusal of the court to give requested charges upon that subject are overruled; and for the same reason, the alleged insufficiency and inaccuracy of the court's instructions upon that subject need not be considered.

We find no merit in the assignment of error objecting to the reading to the court, in the presence of the jury, the reported case of Railway against Brown.

We see no error in the refusal of the court to grant a new trial upon the ground that improper questions were asked witness Ricks, which the court ruled were improper.

There is no merit in the assignment complaining of the court's permitting witness Bennett to testify that there was no effort made to check the train that he knew of. The witness proceeded to show that he knew nothing about it, and the jury doubtless understood the effect of what he said.

It was not necessary to plead any rule of the company requiring engineers to use extra precautions and run slowly, after a heavy rain, in order to prove the fact. The matter is one of evidence and not pleading.

The objection to the court's allowing witnesses Key and Collins to state their opinion as to the speed of the train on the night of the collision is not well taken. The objection that they were not in a position to know the fact goes to the weight of the evidence and was for the jury.

We see no error in the refusal of the court to permit witness Haller to state as an expert that the cars of the freight train would appear to be clear of the track, viewed from the passenger train. The question is not one of expert testimony.

We do not believe we should set the verdict aside, it having been approved by the trial court. The testimony does not show that it is excessive.

We find no error in the refusal of the court to grant a new trial on account of remarks of counsel for plaintiff as to depositions of Sam Wagner. The court instructed the jury to pay no attention to the remarks made.

We see no merit in the assignment relating to the remarks of counsel Baker, commenting on the testimony and place of witness Newt Ferguson.

There was no bill of exception taken to remarks of counsel made the subject to the thirtieth assignment of error, but if exceptions had been reserved, they should not have been sustained.

No error is shown as assigned in the thirty-first assignment of error, in admitting testimony of R. G. Anderson as to Bell's condition, statements, and actions subsequent to the injury. The expressions of Bell were a part of the res gestae; complaints of suffering in his head and his actions are also admissible upon the same ground. It is shown by a mass

of testimony that he must have been suffering as he stated. It was for the jury to say whether or not he was malingering.

It was not error to allow Bell to state what his time would reasonably be worth since his injury, if he had been in usual health.

The thirty-third assignment of error can not be sustained. It complains of cross-interrogatories to Dr. L. A. Grizzard, propounded by plaintiff to the witness, eliciting the fact that he was and had been local surgeon of the Texas and Pacific Railway Company for one year.

Appellant contends that the court erred in overruling its motion to quash the depositions of George W. McDaniel, upon the ground that they were irregularly returned into court. The depositions were delivered to counsel for plaintiff after they were taken by the officer, and he did not file them until defendant had closed its testimony and plaintiff was offering evidence in rebuttal. Defendant's depositions of the same witness stated that Bell's reputation for truth was bad, and the depositions in question qualified this statement, and the witness says: "I can not say that I know his general reputation for truth and veracity, unless it be to this extent: In the past year or so, I have heard parties say frequently that he could not meet his obligations according to his promises, and I have heard complaint against him growing out of such inability to meet his obligations, but no further than to this extent."

We are not aware of any rule that requires a party or his attorneys to file depositions received by him before trial. If defendant had not read the depositions taken by it, there would have been no occasion to read the depositions in question. After defendant's depositions were read, then these other depositions became useful. Upon the ground mainly that there is no rule requiring plaintiff to file the depositions in his possession before the trial begins, we overrule the assignment as to irregularity in returning the depositions. Besides, we can not see but that plaintiff had the right to withhold the depositions until they became useful in rebuttal.

The other objection is that the answers of the same witness to questions are evasive. The witness answered as fully as he was able. It does not appear that he evaded answering.

There was no error in refusing to continue the case on account of surprise in the production of depositions of McDaniel, just considered. There is no merit in the contention.

The thirty-seventh assignment of error is not well taken. There was no error in refusing to allow Dr. Scott to review the testimony of plaintiff in the case and then give his opinion as to "the reasonableness, the correctness, or otherwise of the statements" therein.

We overrule the thirty-ninth assignment of error, which attacks the ruling of the court in permitting witness to testify as to plaintiff's reputation for truth. Defendant had attacked his reputation and plaintiff had the right to rebut.

Appellant contends that the court erred in refusing to charge, as re-

quested by defendant, to disregard all money paid Drs. McCoy, Grizzard, and Gray. It was proved that the amount charged by and paid to Dr. Grizzard was a reasonable charge. The requested instruction applied to this, as well as to amounts paid to other physicians, and should not have been given. As to the $30 paid Dr. McCoy, the court instructed the jury: "If you should find for plaintiff you will not find for any medical attention or services, if any, unless the evidence shows that the same are reasonable in amount and reasonably incurred by reason of the alleged injury." So if the proof failed to show that the medical fee paid to Dr. McCoy was reasonable in amount, the jury were instructed not to allow it. The proof was that Dr. McCoy was paid $30 for what he did. If it was not shown that the amount was reasonable under the charge it could not have been included in the verdict. It was not error to allow the proof of the amount paid McCoy controlling the finding as it was by the charge. This case is distinguished from the case of Railway v. Warren, and Railway v. Belew, 22 Texas Civ. App., 268.

We need not notice other assignments. We have carefully considered every one of them, and conclude that none are well taken.

Finding no reversible error assigned, the judgment of the lower court is affirmed.

*Affirmed.*

Writ of error refused.