HELEN A. CLARK, Appellee, v. IOWA CENTRAL RAILWAY COMPANY, Appellant.

**Railroads:** CROSSING ACCIDENT: CONTRIBUTORY NEGLIGENCE: EVIDENCE. In this action the evidence on the question of defendant's contributory negligence, when struck at a street crossing by a switched car, is held to authorize submission of the issue to the jury.

**Appeal:** VERDICT: QUESTIONS REVIEWABLE. On an appeal from an order granting a new trial because of inadequacy of the verdict, defendant may insist that the verdict should stand and also that one should have been directed in his favor.

**New trial:** INADEQUACY OF VERDICT. Inadequacy of verdict is ground for new trial, and in the absence of an abuse of discretion the courts order will not be interfered with on appeal.

**Same.** The court was justified in granting a new trial for inadequacy of a verdict for $400, where deceased was a school teacher forty-four years of age, earning $60 per month for ten months in the year, and in addition earning from $25 to $50 a year for literary work, and having a life expectancy of twenty-six years.

**Negligent death:** DAMAGES: EVIDENCE. In actions for the negligent death of a person it is not necessary to introduce the life tables; and in the absence of evidence as to the living expenses of a decedent, which the jury would not be bound to follow, they may use their own judgment in connection with the evidence in arriving at the present worth of decedent's life.

**New trial:** ARGUMENT: OPINION OF APPELLATE COURT. The opinion of the appellate court in affirming an order granting a new trial should not be read to the jury on a retrial.

*Appeal from Marshall District Court.*—HON. WILLIAM N. TREICHLER, Judge.

SATURDAY, DECEMBER 13, 1913.

PLAINTIFF, as executrix of the estate of Minnie D. Ashbrook, brought this action to recover damages in the sum of $1,999 for the alleged negligence of defendant causing death of deceased. Trial to jury, and verdict for plaintiff in the sum of $400. Plaintiff moved for a new trial upon two grounds only: First, that the verdict was contrary to the evidence; second, that the amount assessed by the jury was inadequate. The motion was sustained. Defendant appeals.—*Affirmed.*

*Boardman & Lawrence* and *W. H. Bremner* (*George W. Seevers,* of counsel), for appellant.

*J. J. Wilson,* for appellee.

PRESTON, J.—No evidence was introduced on behalf of defendant. There is no complaint by either party as to the

instructions or any of the rulings on the admission or exclusion of evidence. It appears that deceased, while crossing the tracks of defendant railway, in the city of Marshalltown, was struck and killed by one of defendant's cars, which was being switched across the street. The grounds of negligence alleged are, substantially: First, switching the cars across the street without being in charge of a brakeman; second, not closing the gates before deceased went on the tracks; third, not giving warning of the approach of the car. At the close of the testimony, defendant moved for a directed verdict because the plaintiff had failed to prove that the negligence alleged was the proximate cause of the injury; that deceased was guilty of contributory negligence; and that such contributory negligence was the proximate cause of her injury. The motion was overruled. The car which struck deceased was being kicked across the street crossing by a switch engine. It was not attached to the engine, and there was no one in charge of the car.

It is not seriously contended by appellant that the evidence was not sufficient to take the case to the jury on the question of the negligence of the company. The errors assigned for reversal are: (1) That the verdict was warranted by and sustained by the evidence, and the court erred in setting it aside. (2) That the evidence shows beyond dispute and contradiction that the deceased was guilty of contributory negligence. (3) That the evidence shows beyond dispute that the contributory negligence of the deceased was the proximate cause of the injury.

I. The facts, briefly stated, are that deceased and three other ladies were going south on the east side of the street. The north gates were let down behind the deceased and her companions. The flagman who operated the gates from the tower saw deceased and says he let the gates down behind them and started to lower the south gates. Deceased had crossed over the north track, and the switch track south of

1. RAILROADS: crossing accident: contributory negligence: evidence.

it, when the wind blew her hat off. The hat was blown back north, and deceased started after it. A witness says: "As soon as she passed the building, she would have a plain view of the car. She went directly back after her hat, and did not stop. She went just like a person would, in a good quick move to pick up something that was blowing on the ground—a sort of a half walk and a half run—and proceeded in this way directly onto the track, without stopping." At about this time the car struck her. Another witness says that when the car hit her she was approximately on the sidewalk. She did not get to where her hat was. The flagman started to lower the south gate about the time deceased started for her hat. The south gate was not down far enough to bar her passage as she went back for her hat. If she had been a little later, the gate would have been down far enough to bar her passage. Another witness says: "At the time the car struck her, she looked as if she was turning around to come back. She was on the east side of the sidewalk when the car struck her. The car pushed her across on the west side of the street, where there is a large, square tie, which kind of stopped her, and the car ran over her and went on." Another witness says: "She was going after her hat. Her hat was between the two rails, further north of her. She had evidently started for her hat and became confused. If she had gone on, she would not have been hit by the car. You could tell by her action as the car struck her that she was in the act of turning to start back. She was looking just about southwest, turning kind of aside of the car, looking and turning, as if she was trying to get away from the car. There were no other cars there on the tracks that prevented her looking north. There wouldn't be anything to obstruct her view as she passed out from the line of the building—to obstruct her view northeast when she once got by this corner of the building. Looking northeast, she could see right across towards any car that was coming along this track. She could see the car that was coming down the track after she got

past the corner. There was nothing to obstruct her view of the car that was going west if she had been looking that way."

The flagman says: "The switch engine had backed down across the crossing and was preparing to kick the car back west. I observed she had plenty of time to go in front of the engine, and she got across in front of the engine. The car had not started west as she went across in front of the car. After she passed the south gate, I started to lower that. I am not positive whether I rang the bell when I pumped the south gate down. I usually ring the bell. I did not see her come running for her hat. I started to lower the south gate as soon as I saw that she was safely across so the gate wouldn't hit her. Then I started to lower it right away. The reason I didn't see her run back was because I had to turn my back in that direction to get to the pump. The gates over the street and the gates over the sidewalk come down at the same time. There is a bar comes down in front of the sidewalk and blocks the way. I did not have any idea, from the way Miss Ashbrook was going at the time that I last saw her, that she was going to turn around and run back towards the track. From the time that she passed the south gate and I commenced to pump the gate down, she had not made any movement of any kind to indicate that she intended to turn around and go back north."

The fireman testified: "We started to make the switch after we had seen that she had gone clear across south. Next I saw her was when she came back after her hat. I saw her hat rolling down the sidewalk, and the wind rolled it on the west side of the crossing, and as she stooped down I couldn't see her head or hands. She stooped, or something, when the car struck her. I don't know whether you would call it running after her hat. She was going about like anybody would go after a hat. There was nothing that would have prevented her, if she had looked, from seeing the car coming. As she came out onto the tracks, she proceeded onto the track with-

out stopping. She did not stop, look, or listen as she went onto the track."

The switchman testified: "I heard somebody holler, but she did not pay any attention to it. I don't know for sure who it was that called, but I think it was Woodmansee. It was before she got onto the track that somebody hollered."

Another employee of defendant testified: "I was inside the Iowa Central freight depot when the accident happened. I couldn't see the gates at all. I got up when Mr. Woodmansee hollered and looked out. I heard Woodmansee holler. He hollered at her before I saw her. I didn't see her until after he hollered. That was what attracted my attention to the accident. I knew it was Woodmansee hollering. He came in the door of the freight house and hollered, 'My God!' and I jumped up and went to the window and saw the accident, or the remaining part of it."

Such is the general tendency of the evidence of the witnesses mentioned, and others. They do not all agree exactly as to the details. They were not all in the same position. The witnesses do not all agree as to her exact position at the time she was struck. Some think she did not get to the hat; others thought she was reaching for it.

Under the circumstances, we are of opinion that it was a fair question for the jury to say whether deceased was negligent in failing to observe the approaching car. She was somewhat confused and excited at the time; her attention was diverted by her hat blowing off and in her efforts to recover it; the gate was not down; the car was coming at about four miles an hour, and, coming alone, it would make but little noise. As to the alleged warning, it is not shown that any one spoke to her, nor is it shown what was said, or that she heard. The party who is said to have "hollered" was some distance away. We have all seen a person chasing a hat up the street and heard some one call out. This would not convey any particular meaning to the person pursuing

the hat, nor have any effect, except perhaps, to add to the embarrassment of the other party.

Defendant has the right to contend here that a verdict should have been directed, yet ask to have the verdict returned to stand, that the expense of another trial may be avoided, if we should hold that there should have been a directed verdict. *Talty v. Atlantic*, 92 Iowa, 140.

2. APPEAL: verdict: questions reviewable.

II. The motion for a new trial was sustained because the damages awarded by the jury were inadequate. Formerly this was not a ground for a new trial, but it is now, and, when granted, the court's discretion will not be interfered with in the absence of its abuse. *Ward v. Marshalltown Light Co.*, 132 Iowa, 578.

3. NEW TRIAL: inadequacy of verdict.

While the evidence is meager at some points as to damages, we think the trial court was justified in holding that $400 was inadequate. Deceased was a school teacher, forty-four years of age. Life tables show that the expectancy of a person of that age is nearly twenty-six years. She was earning $60 a month for ten months in the year, and, in addition, earned on an average of $25 to $50 per year by her literary work. There is no evidence to show what it cost her to live, or that she had saved anything, or her condition of health. The damages in such cases are, of necessity, more or less uncertain, and it is for the jury to use their judgment and discretion, which is of course subject to correction.

4. SAME.

It has been held that it is not necessary to introduce the life tables. *Beems v. Railway*, 67 Iowa, 435. In such case, the jury would have but little to guide them as to the length of time a person is likely to live, and, if the life tables are introduced, it does not follow that the person will live out the expectancy of a healthy person of that age. The matter of the cost of living is one of such common observation that a

5. NEGLIGENT DEATH: damages: evidence.

jury would have some reasonable idea about it. They would have the right to consider that here was a lady school teacher, forty-four years of age; such a person is likely to be of good habits. If her board should be $5 per week, and clothing $150 to $200 per year, she could save $200 per year. Her expenses might, of course, be much more, or they might be less. If evidence had been introduced as to the value of board, etc., the jury would not have been bound to follow it, but could use their own judgment in connection with the evidence as to value. *Hoyt v. Railway Co.*, 117 Iowa, 301; *Converse v. Morse*, 149 Iowa, 454, 456. Two hundred dollars per year for twenty-six years, had she lived out the expectancy of a person of that age, would amount to $5,200, the present worth of which would be in the neighborhood of $2,000; $100 per year would be about $1,000. We are giving these figures merely as an illustration. We think any fair-minded person would ordinarily be impressed that $400 is an inadequate compensation for the death of such a person.

If the case is tried again, this opinion ought not to be read in the presence of the jury, lest they get a wrong impression. The opinion is not for the benefit of the jury. The case may be tried on a different theory, or

6. NEW TRIAL: argument: opinion of appellate court.

on different evidence. We should be permitted to discuss these matters freely in an opinion without improper use being made of the discussion. The courts are often asked to reduce excessive verdicts, and it is done. There is no reason why plaintiff should not be protected in the same way if the verdict is inadequate. It has been held that the court has the same power to require a defendant to consent to an increase of the verdict, if inadequate, or submit to a new trial, as to require a plaintiff to consent to a reduction, if the verdict is excessive. 47 L. R. A. 51, note. But that question is not raised in this case. We do not, therefore, determine it.

We are of opinion that there was no abuse of discretion in granting a new trial. The order is therefore *Affirmed*.

WEAVER, C. J., and LADD and EVANS, JJ., concur.