**BAUSH MACH. TOOL CO. v. ALUMINUM CO. OF AMERICA.**

No. 480.

Circuit Court of Appeals, Second Circuit.

Sept. 16, 1935.

218

· MANTON, Circuit Judge, dissenting.

William Watson Smith, of Pittsburgh,. Pa., Edward F. McClennen, of Boston,. Mass., Frederick H. Wiggin, of New Haven, Conn., Frank B. Ingersoll and Leon E. Hickman, both of Pittsburgh, Pa., and Edward Williamson, of Boston, Mass., for appellant.

Cummings & Lockwood, of Stamford,. Conn., and Edward C. Park, of Boston, Mass. (Mark W. Norman, of New York City, Claude B. Cross and Edward C. Park, both of Boston, Mass., and Raymond E. Hackett, of Stamford, Conn., of counsel), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This litigation was first before this court on an appeal from an order relating to a. bill of discovery. See 63 F.(2d) 778. Following that the case was tried to a jury in the District Court, where a verdict was returned in favor of the defendant and judgment entered thereon. The plaintiff's appeal to this court resulted in a reversal and remand for a new trial. See (C. C. A.) 72 F.(2d) 236. At the second trial, the plaintiff obtained a verdict for $956,300, upon which judgment for three times that amount, together with costs including an attorney's. fee of $300,000, was entered. The present appeal is from this judgment.

The defendant, a Pennsylvania corporation, is the sole producer of virgin aluminum in the United States. Its business is the outgrowth of that of the Pittsburgh Reduction Company which began to manufacture aluminum at Pittsburgh, Pa., in 1888. Its predecessor and the defendant' will hereinafter be treated as one and called the defendant. It acquired the rights under the United States patents to Charles M. Hall which issued in 1886 and disclosed a revolutionary process for extracting alumina (the oxide of aluminum) from the base ore bauxite by means of electrolysis and mainly because it controlled these patent rights succeeded in vastly increasing the production of aluminum at a small percentage of its former cost. Before the Hall patents expired in 1903, the defendant was firmly entrenched in the business of producing virgin aluminum in this country, and it has ever since successfully maintained its supremacy in that field. It strenuously insists that this, however, has been due solely to the momentum of its patent

monopoly coupled with its business skill and financial resources which have been employed at all times without violation of the anti-trust laws.

There are producers of virgin aluminum in foreign countries who have branches in this country from whom domestic users who do not choose to deal with the defendant may buy. The only ones which need be mentioned are the British Aluminum Company, Limited; L'Aluminium Francais (French); Alumunium Industrie (Swiss); and a German company, Vereinigte Aluminum Werke Aktiengesellschaft. They will hereafter be referred to as the foreign producers.

Besides virgin aluminum, the defendant and the foreign producers also manufacture aluminum alloys which have a higher tensile strength than the pure metal and have been given various trade names. One which is perhaps most commonly known is called "duralumin" and was first developed commercially in Germany under that name. The defendant's product of similar composition and quantity is known as 17S and was first made in 1916.

Though the defendant alone produces virgin aluminum in the United States, there is a large business, which it does not control, in the reduction of aluminum scrap that yields a product not as uniform in quality but in other respects the equal of the virgin metal. The defendant's virgin aluminum and its alloys are sold in ingot form to manufacturers of aluminum sheet, wire, tubing, electric cable, foil, powder, rods, forgings, extruded and structural shapes, and many other articles. No distinction will be made herein between the pure aluminum and the alloys, but both will be called "aluminum."

Besides selling to manufacturers, the defendant has domestic subsidiaries who manufacture all kinds of aluminum products and who compete directly with independent manufacturers of such goods. Until 1928 it also had foreign subsidiaries and itself engaged in foreign business, but in that year a Canadian corporation, called "Aluminium, Limited," was organized to which were transferred all of the defendant's foreign holdings, except its Dutch Guiana bauxite mines and the Alcoa Power Company which owned a water power development in Canada, in return for all of Aluminium, Limited's, capital stock. This stock was at once distributed to the defendant's stockholders in the ratio of one share of Aluminium, Limited, to each holder of three shares of the defendant's stock. Since then changes in stock ownership have occurred, but a small group of stockholders common to both corporations have always owned more than half of the stock of each. Since the organization of Aluminium, Limited, the defendant has confined its business to the United States.

The plaintiff, a Massachusetts corporation, is a manufacturer in Springfield and Chicopee, Mass., whose business in part is the making of aluminum products from aluminum ingot. It was already well established in business when, in 1919, it entered this field. Its aluminum business led a precarious existence from the start and was never a profitable venture. On April 18th in that year, the plaintiff brought a suit similar to this against the defendant in the District Court for the District of Massachusetts which was pending, though never tried, when the present action was brought in Connecticut on July 24, 1931.

The gist of its complaint is: (1) That the defendant has monopolized interstate trade in virgin aluminum by unlawfully combining and agreeing with the foreign producers that they will all charge substantially the same prices for virgin aluminum in this country; (2) that it so combined and agreed with Aluminium, Limited, that Aluminium, Limited, would not compete with it in the United States by selling virgin aluminum here; (3) that it did itself, and with its domestic subsidiaries, monopolize and restrain interstate trade in virgin aluminum; and (4) that it did, or attempted to, in concert with its domestic subsidiaries, monopolize interstate trade in substantial part by keeping the price of virgin aluminum high and the price of products manufactured from it low so that it was impossible for the defendant to compete with it in the manufacture of aluminum products, in that the cost of defendant's raw material plus the cost of manufacture and sale exceeded the price at which its product could be sold in competition with similar products so manufactured and sold by the defendant. In this connection the domestic subsidiaries of the defendant and the defendant will be herein treated as one.

The assignments of error are needlessly numerous. They cover no less than ninety pages in the record. None of them question the sufficiency of the evidence to take the issues to the jury. The occurrences

which prejudiced the defendant, so it claims, have to do with the conduct of the trial wherein it is said that the trial judge abused his discretion; ruled erroneously in excluding and in admitting certain evidence; and made errors both of omission and commission in the charge.

█ The evidence that the defendant had violated the anti-trust laws as charged by the defendant was largely circumstantial. The only direct evidence of any such unlawful agreement is found in the testimony of Haskell, the plaintiff's president, who testified to a conversation he had with A. V. Davis, the president of the defendant, in which he said Davis told him that the defendant and the foreign producers had an agreement fixing the price at which they would all sell aluminum in the United States, which price the plaintiff must pay to obtain its raw material. Davis denied any such conversation, and other evidence than his own testimony tended strongly to discredit Haskell. The issue of credibility thus raised had been squarely presented to the jury in the first trial of this cause in a charge which made the verdict turn on its determination as to the verity of that evidence, and the jury then found not in accordance with Haskell's testimony but in favor of the defendant. In our reversing opinion [72 F.(2d) 236, 240] we held that the issues could not be confined so closely, saying in part: "Appellant's claim for damages is based upon the claim that the appellee had a monopoly. It was obliged to prove injury by the monopoly. It first attempted to show there was in fact a monopoly, and, for this purpose, evidence was admissible to show the conduct of persons in control and agreements and acts done preceding the vesting of power. Such evidence could be considered, although the acts occurred prior to the injury. To exclude this evidence was error. Nor should the appellant have been restricted to the introduction of evidence relating to transactions with domestic corporations. Relations with foreign corporations were admissible also for another reason. A monopoly within the United States created by contract or agreement with foreign corporations is unlawful. * * * The contracts entered into by the appellee and the appellee's subsidiaries with foreign corporations and the purchase of stock in these foreign corporations were admissible for the purpose of showing a tacit understanding not to compete. * * * The evi-

dence of uniformity of prices in the United States which the appellee and the foreign producers charged over the period from 1919 to 1931, inclusive, under the circumstances, as the evidence disclosed, might well support a finding by the jury of an agreement between the appellee and the foreign producers. This issue should have been submitted to the jury irrespective of belief or disbelief of Haskell's testimony. Conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done and from the circumstances. * * * The evidence presented by the appellant should have been submitted. * * * Moreover, the relationship of Aluminium, Limited, with the appellee and the holdings of Aluminium, Limited, in the foreign corporations, were items not to be disregarded."

At the instant trial one Babson, the vice president and general manager of the plaintiff, was produced as a witness for the plaintiff. During his examination by plaintiff's counsel he testified to making a trip abroad in 1929, during which he visited Switzerland and talked with officials of the Swiss company at Neuhausen. After saying that he talked with a Mr. Kaufman, who was then director of sales for the Swiss company and that he asked Kaufman to quote him a price for aluminum, the question, "What did he say?" was asked. To this counsel for the defendant objected on the ground that it was hearsay. The attorneys for both parties immediately began to discuss its admissibility with the court in the presence of the jury, in the course of which the court said there was evidence already in the case tending to show that the foreign companies and the defendant had agreed on a schedule of prices. To this statement defendant's attorney objected as not being correct, whereupon the trial was stopped while Haskell's testimony was looked into to determine whether there was evidence as indicated. A portion of it to that effect was found and then read to the court. After the reading plaintiff's counsel said: "But, if your Honor please, we do not base our claim with respect to the evidence upon any such narrow and specific ground as that, and I must say with all due respect— " He was then interrupted by the judge, who said: "It would be admissible on that ground, sir." To which counsel replied: "It would, indeed, but we do not claim it on that ground alone, and I say, with all due re-

spect that if your Honor had said that there was not evidence already in the case showing that the Aluminum Company and the foreign companies had agreed on a schedule of prices, I would have been compelled to take an exception to it because the opinion of the United States Circuit Court of Appeals on this very question, dealing with this evidence which has already gone in, is as follows— " At this point defendant's attorney objected to reading from our opinion. When told to let plaintiff's attorney finish and that his objection would be treated as seasonable, he informed the court that: "I was going to call it to your attention that this is a statement of a court not on this record, and I submit it is not admissible before a jury. It is not a statement of any proposition of law. It is a statement which purports to be a narrative drawn not from the evidence before this jury, and that is my objection to its being read. I submit that it should not be read." Upon being assured by plaintiff's counsel that what he proposed to read " * * * is not a question of fact but of law, and the law of this case, * * *" the portion of our former opinion which has been above quoted was read to the court before the jury. Defendant's attorney then renewed his objection, saying: "I renew my objection and save my exception to this having been read, specifically because it is a statement that is entirely, so far as this case is concerned, hearsay of the testimony in another case, and in a case that your Honor cautioned the jury that they should abstain from discussing or learning anything about, and is a statement based not upon the evidence that is before this jury. Those are the grounds of my exception." Then the following took place:

"The Court: But it seems to me that we have already got evidence on every one of those questions in the case now.

"Plaintiff's Attorney: Every one of them; every one of them.

"Defendant's Attorney: Whether we have any evidence on this subject, if your Honor please, does not make it any less the fact that the statements read to the jury were not based on this evidence in this case, and it is merely bringing in a hearsay report of what was in another case, reading a part of the opinion about what was the situation apart from this Haskell testimony, and I submit that it brings before the jury things which are not before the jury by the evidence in this case, and is

doing the very thing with your Honor's sanction, that you directed the jury to avoid doing—finding out anything about what had occurred in that other case.

"The Court: No, I do not agree with you at all on that theory. The opinion that counsel has read states the law of this case. That opinion is directions to me as to what to do on this trial. They are my orders.

"The Foreman: Let us put it the other way around. In your charge wouldn't you have given about the same thing as this anyway?

"The Court: Yes, but more in detail.

"The Foreman: The point is that we would have heard it at some time, whether now or later.

"Defendant's Attorney: Well—

"The Court: It is a new practice to me to have objections—I will withdraw the word 'objections'—I have always been accustomed to have counsel raise questions of law and you have raised your objections here. The Foreman has a right to ask me what the law is. When we recessed I had not thought of this theory that you have just read from the opinion of the Court of Appeals, but I was proceeding on the very elementary and well-established rule that when evidence in a case tends to show a combination or a conspiracy, then the declarations of any of the conspirators in pursuance of the conspiracy are admissible, and it is an exception to the hearsay rule. If you are willing to proceed on that theory, all right. Have I stated it correctly?

"Plaintiff's Attorney: Yes, sir, and upon this further ground that is stated here, that all of this evidence together establishes that, if credited.

"The Court: I will admit it on both theories."

This exception should be considered in connection with another exception taken to the reading from our former opinion a few days later during the cross-examination of one MacDowell, the first witness called by the defendant after the plaintiff rested. This witness had testified that he had spent many years in Japan as a salesman for the defendant and was familiar with the aluminum situation and prices in Japan when he was there; that he was sales manager of Aluminium, Limited, which sold aluminum in Japan; and that following the Japanese market was a part of his business with which he was familiar. He was then

asked: "What was the price of aluminum in Japan in 1930?" At this point the following took place in the presence of the jury.

"Defendant's Attorney: This I object to, if your Honor please.

"The Court: Do you propose to show that the prices were uniform?

"Plaintiff's Attorney: No; I propose to show that Japan was a free market. Until they had this agreement with the Swiss company there really was some competition in Japan, that aluminum was selling at about 14 cents, which would indicate what its price would be in an open and free market.

"The Court: Did the Circuit Court say anything about this, admitting evidence of prices? I don't recall that they did.

"Plaintiff's Attorney: Well, if your Honor please, I do not think it did specifically, but of course it did in a legal sense when it dealt with what would be the price in a competitive market, and naturally, there having been only one producer in the United States, there could not be any competition between two producers here, so that we have to seek for the best that we can to show what it was if taken in the free exercise of competitive forces, and that would take us to Japan.

"Defendant's Attorney: There was nothing whatever in the opinion of the Circuit Court of Appeals bearing on this subject, either expressly or by any reasonable inference from what they did say.

"The Court: Not by indirection?

"Defendant's Attorney: Not by indirection, in any way.

"The Court: Well, I have read that several times. I read it last evening again. It is quite a long opinion. I have had a brief on it. You treated it quite elaborately in your brief.

"Defendant's Attorney: Yes, your Honor.

"The Court: I don't remember whether you cited any cases or not.

"Defendant's Attorney: There are some cases cited. I say, there are cases cited. I do not want to say that they go to the specific point where you are considering what a concern in Springfield, Massachusetts, should pay for aluminum. It is rather remote to show what the price is in Japan. But I submit that the body of the decision would indicate that that is far too remote to have any bearing. I do not suppose that when we are trying what a steam laundry should charge here we can show what a Chinaman charges for doing collars in China. It is the same thing. I submit it is too remote.

"The Court: If you were trying to show uniformity of prices I should be inclined to admit the evidence. Aren't we going to wander into paths where you will have to take into consideration a great many other things,—the price of labor, the price of transportation, the price of power?

"Plaintiff's Attorney: No, indeed, if your Honor please. Those who sold in Japan were the foreign producers and the American company, so that the cost of production would be exactly the same, and the cost of labor, no matter where they sold. That determined the cost to them of the product itself. This aluminum was not made in Japan; it was shipped from Canada to Japan. And it was shipped from Europe to Japan. The cost of the aluminum that was shipped to Japan, to the shippers, was exactly the same.

"The Court: You and your associates have talked that over and considered it, probably very carefully.

"Plaintiff's Attorney: We have, indeed, sir.

"The Court: I will admit the evidence.

"Defendant's Attorney: I would like to call attention to the fact that it was just said that the 'American company'—I suppose it means the defendant—

"The Court: No; the Canadian company.

"Plaintiff's Attorney: Aluminium, Limited.

"Defendant's Attorney: It is so common to speak of the American Company as meaning the United States Company that I thought that was what was meant. If it was not to mean the defendant, then it requires a correction. And I save an exception, if your Honor please, to the admission.

"The Court: Certainly.

"Plaintiff's Attorney: Of course I did refer to the Aluminium, Limited, but we at all times will stress the fact that Aluminium, Limited, is controlled by the same people who control the defendant.

"Defendant's Attorney: That, if your Honor please, there is no evidence on, un-

less by that all that is meant is that the persons, who, in the aggregate, are a majority of the stockholders of the Aluminium, Limited, also, in different proportions, but in the aggregate, hold a majority of the stock of the Aluminum Company of America. That is not control in a legal sense. There are no common officers or directors. There is no indication that there has been any influence exerted by the stockholders of the Aluminum Company of America upon the operations of Aluminium, Limited, and therefore—I am sorry to take so long, if your Honor please—

"The Court: No, No.

"Defendant's Attorney: But the charge having been made of control, I want to call attention to the fact that there is no evidence of any such control. But of course that has no bearing on the admissibility of this particular question.

"The Court: There are either four or six people, as I remember the evidence, who control each company. The same four or six.

"Plaintiff's Attorney: Four. Two Davises and two Mellons.

"The Court: That is, who had stock enough to control a declaration of the directors.

"Defendant's Attorney: If your Honor please, if, as a matter of law, a son and a daughter controlling a holding company are to be identified with the father who owns stock in another company and does not control the holding company. And I submit that if one desires to be accurate in such matters, it is not proper to speak of those as one.

"The Court: Well, would it be accurate to say this: You take the father out and put in the son and daughter, and it would make it five.

"Defendant's Attorney: Well, the son and daughter, and the company in which they hold all the common stock, are not stockholders in the American company at all. So that the whole block is not to be treated as one thing. But that of course has no bearing whatever upon this particular matter that is now under consideration. If there are in the majority of the stockholders in one company, forty stockholders, and that same forty, in other proportions, are the controlling stockholders in the other company, the situation is no different from what it is if there are four, five, or six stockholders who are common to the two companies and in the aggregate hold a majority. There is nothing contrary to law in any way in having the majority of the stock in one company held by those who hold the majority of the stock in another company. It does not constitute a control that infringes the law in any way. In the cases that have been cited, even in dissolving these alleged illegal combinations, the Supreme Court of the United States has permitted the stock in the two companies that are separated to go into the hands of the same persons in some proportion. It is a perfectly legal thing; it does not constitute control. As I say, it has no relation to the price in Japan.

"The Court: It does not, of course, constitute control, but it may. They may combine and agree among themselves so that it would constitute control.

"Defendant's Attorney: Precisely. And it is just what I said. There was no evidence that they ever had done any such tying in this case, and that is the reason why I have been so urgent that we should try this case on evidence and not on predictions or claims.

"The Court: Does not the Court give me any directions to submit the questions to the jury if the evidence is the same now as it was before?

"Defendant's Attorney: I think not that question, if your Honor please.

"The Court: I think so.

"Defendant's Attorney: But at all events, the price in Japan does not bear on that.

"The Court: Read what the Court said.

"Plaintiff's Attorney: Yes, I have it right here, your Honor.

"The Court: Read it.

"Defendant's Attorney: Before you read that. This raises again the question on which your Honor has ruled against us, but it seems to be a repetition so that I will preserve my rights. I object to the portions of the opinion of the Circuit Court of Appeals being read in the presence of the jury where that Court states what was in evidence in the other trial, or what could be shown by that evidence, because that evidence is not in this case.

"The Court: This does not refer to evidence; it just tells me what I am to allow.

"Defendant's Attorney: Of course I do not know what is going to be read, but from the experience of the past in reading I suppose it is subject to this objection.

"The Court: You are to read what they say about the small group of stockholders, and so forth.

"Plaintiff's Attorney: I am to read, if your Honor please, addressing myself to the question particularly raised by Mr. McClennen as to the admissibility of this evidence, what the Circuit Court of Appeals has said upon this subject.

"The Court: It is under my orders, gentlemen. I have got my orders from the Circuit Court.

"Defendant's Attorney: Then may I save an exception to your Honor permitting this to be read in the presence of the jury?

"The Court: Certainly.

"Plaintiff's Attorney [reading from the opinion of the United States Circuit Court of Appeals for the Second Circuit (72 F. (2d) 236, 241), reversing the judgment entered for the defendant at the first trial of this case]: 'Moreover, the relationship of Aluminium, Limited, with the appellee and the holdings of Aluminium, Limited, in the foreign corporations were items not to be disregarded. Aluminium, Limited, on its organization had transferred all of its shares to the appellee'—that is the Aluminum Company of America—'in exchange for all of the foreign business and holdings of the appellee. The appellee distributed these shares to its stockholders. In December, 1931, control of a majority of the shares of this corporation was in the hands of four men of prominence in appellee's organization—its chairman of the Board of Directors, its president, a director, and a large stockholder of the appellee. Numerous other officers of the appellee also held stock in Aluminium, Limited.'

"The Court: That is enough.

"Plaintiff's Attorney [reading from (C. C. A.) 72 F.(2d) 236, 241]: 'Although such a relationship would imply the dictation of the policies of Aluminium, Limited, by its controlling bodies—and therefore an order rather than an agreement not to compete in the United States'—this brings us down to the precise point he has been arguing—'that implication does not negative the fact that the close relationship of the two competitors might carry with it a tacit agreement between the two corporations proper not to compete with each other. Nor does it eliminate the possibility of an authorization of the offspring, by the appellee, to arrange for the distribution of available markets with foreign producers.'

"The Court: Well now, I am not clear about the price in Japan, but I will let you have your way about it.

"Defendant's Attorney: My exception, your Honor.

"The Court: Certainly, and I suggest that you confer again during the luncheon hour about that."

Though the foregoing excerpts from the record which have been given at long length, for greater clarity designating the remarks of counsel by the terms defendant's attorney and plaintiff's attorney, respectively, contain primarily a discussion of legal questions had between counsel and court which when indulged in briefly are often helpful and, indeed, necessary common practice in the presence of the jury, a majority of this court believes that in this instance the defendant was so seriously prejudiced by what was done that a fair and impartial verdict based solely upon the evidence in this record could not reasonably be expected.

During the discussion as to the admissibility of the question asked Babson, the real issue was whether it called for hearsay. The general admissibility of uniformity of prices set by the foreign producers and the defendant was discussed in our opinion, but nothing as to whether or not the question asked called for admissible evidence. The judge very properly ruled the evidence admissible as against the only ground of objection to the question, and then the insistence of plaintiff's attorney in reading what we had said as to the effect of such evidence, ostensibly to secure a broader ruling after the judge had already indicated his readiness to admit the evidence without any restriction whatever, put before the jury our opinion as to the weight to be given that evidence. Not only was that done, but it was, inadvertently, done with great emphasis when the judge referred to the opinion as his "orders." That what was said was being closely followed by the jury is apparent from the remarks of the foreman. It seems entirely clear that the direct tendency of what was done was to inform the jury that the appellate court from whom the trial court took "orders" had decided

that if uniformity of prices was shown the jury would be expected by this court to find that they were established by an unlawful agreement between the defendant and the foreign producers; that a finding of such an unlawful agreement would follow as a matter of law in accordance with an opinion to which the trial court must bow. The curtailment of the scope of the jury's independent judgment as to the weight of the evidence was thus made rigid without any explanation that what we had said was not binding upon the jury on that subject. Of course this was not done by reading directly to the jury, but by reading directly to the judge what the jury could hear and what it could not help but believe was the law which pointed the way to its duty once it was satisfied that practical uniformity of prices had been established.

The reading during MacDowell's cross-examination but served to add to damage which had already wrecked the defendant's chances of having the jury return a verdict not dictated by what we were thought to have decided as to their duty. There was nothing in our opinion dealing directly with the admissibility of the prices Aluminium, Limited, charged for aluminum in Japan. When objection was made to the question, the evidence, following some discussion, was admitted. Then the answer was not taken, however, as a discussion immediately arose as to whether or not Aluminium, Limited, was controlled by the same people who controlled the defendant. After conflicting claims as to what was in evidence concerning that had been advanced by the attorneys, the judge desired to know what we had said. Reading from our former opinion in the presence of the jury was again objected to by the defendant but without avail, and then were read as above set forth the general statements as to the common control of Aluminium, Limited, and the defendant by four men of prominence in the defendant's organization with the expressed thought that though this implied as to Aluminium, Limited, "an order rather than an agreement not to compete in the United States that implication does not negative the fact that the close relationship of the two competitors might carry with it a tacit agreement between the two corporations proper not to compete with each other." Certainly the question whether the defendant and Aluminium, Limited, were in fact controlled as one was of necessity· to be determined from the evidence in the case being tried. It is highly significant that when this question arose it was resolved by reading our version of what the evidence admissible in the former trial showed as to that and what in our opinion might follow from it as a conclusion of fact that the defendant had a tacit agreement with Aluminium, Limited, concerning, prices to be charged for aluminum in the United States. This was one of the vital issues before the jury. It was purely a question of fact, and when our opinion as to the effect of the evidence was made known to the jury with the indication that what we said were "orders" to the trial court, it is impossible to believe that what was done could have been understood by the jury other than that such tacit agreement had in our opinion been recognized as an existing fact.

This is quite other than the perfectly proper practice, in cases requiring submission to a jury, of having a federal trial judge make such comments to the jury as he thinks helpful as to the weight he believes attributable to the evidence in the case being tried provided he leaves the jury, notwithstanding, free to decide the issues of fact for itself in accordance with its own analysis of the evidence. What was done had the effect of a peremptory command to that jury to draw the conclusions of fact we had said might be drawn. To be sure this aspect of its duty was not shown to it by any direct reading to the jurors, but no one could reasonably believe that when they were made acquainted with what we had said, its supposed import was not as thoroughly driven home as though that had been its avowed purpose.

We have before reversed when our opinion in the same case on a former appeal was read to the jury. The danger inherent in so doing and the consequences which may result are well set forth in · Press Publishing Co. v. McDonald (C. C. A.) 63 F. 238, 26 L. R. A. 53. Certainly it is proper enough for an attorney to inform the court as to the law claimed to be applicable to any issue which may arise during a jury trial and to do so in the presence of the jury provided it is done in a way which leaves the jury free to find the facts solely from the evidence introduced at the trial and to reach a verdict upon those facts and the law expounded by the presiding judge. The error in

the method here adopted lies in so getting before the jury our interpretation of the evidential effect of what we held should have been admitted in the former trial that when it was admitted in this one the case was prejudged in respect to highly controverted issues which it was vital for the plaintiff to establish and which were proved, if proved at all, by circumstances that might or might not have existed without any unlawful agreement on the part of the defendant. As to this the defendant was entitled to have the jury exercise its own judgment as to the facts and the plaintiff was entitled to no more. When our opinion as to the weight attributable to the evidence was read, in every practical sense, to the jurors without any explanation that what we had said in that respect was only in connection with the former appeal and not intended for the guidance of the jury in finding the facts, the trial took such a turn that we cannot say that the jury was not, in returning its verdict, following a course so pointed out rather than deciding the issues upon the evidence introduced. Where reading to the jury from the opinion of an appellate court does so circumscribe the jury's function to decide the facts, the judgment should be reversed. Brown et al. v. United States (C. C. A.) 298 F. 428; Arey v. DeLorica (C. C. A.) 55 F. 323; Butler v. Slam, 50 Pa. 456; Laughlin v. Street Ry. Co., 80 Mich. 154, 44 N. W. 1049; Olney v. Boston & Maine R. R. Co., 73 N. H. 85, 59 A. 387; Hudson v. Hudson, 90 Ga. 581, 16 S. E. 349; Clark v. Iowa Cent. Ry. Co., 162 Iowa, 630, 144 N. W. 332, Ann. Cas. 1916B, 457; Griebel v. Rochester Printing Co., 24 App. Div. 288, 48 N. Y. S. 505; Allaire's Heirs v. Allaire, 39 N. J. Law, 113.

■ During the trial, the deposition of A. V. Davis was read to the jury. In cross-examination he had been asked: "There was a suit brought by the government of the United States against the Aluminum Company of America and a decree entered, was there not?" When, in reading the cross-examination, plaintiff's counsel came to this question, the attorney for the defendant objected to its being read, but the objection was overruled. The question referred to a consent decree entered in 1912 in the government's suit. Previously the witness had testified that parts of an agreement made by the defendant with the Norton Company on April 20, 1909, had been abrogated and it was the apparent purpose of the plaintiff to show that the abrogation had been due to the suit. Being a consent decree, the decree itself was inadmissible. 15 USCA § 16. This was well known to plaintiff's attorney, for he stated during the discussion which ensued following the objection to the reading of the question: "If we were to offer a decree under conditions which we knew obtained, it would be inadmissible; therefore we have not in mind to offer anything of the kind. We are simply asking for facts which are within the knowledge of this witness, as bearing upon his statement as to how this came to be abrogated." From this episode much was made. The defendant indicated a desire to introduce the decree in evidence inasmuch as the fact that one had been entered had been made known to the jury but later decided not to. The opportunity thus afforded to argue to the jury that the defendant was electing to keep the contents of the decree out of the case was seized upon and much was made of what was really a false issue. Commonwealth v. Coughlin, 182 Mass. 558, 66 N. E. 207. As similar trouble, however, may be avoided at a retrial by simply excluding the question before the deposition is read, we need make no further comment.

Many of the other exceptions argued relate to questions which are not likely to arise again, and so need not be noticed. Most of the questions as to the admission and exclusion of evidence may be resolved by reference to our former opinion. It may be worth while now to indicate our opinion briefly as to some of them.

■ The defendant claimed that the failure of the plaintiff to operate its aluminum business profitably was due not to the high prevailing price of its raw material and the low competitive price of its product, but to the inefficiency of its plant with resulting high manufacturing costs. To meet this the plaintiff proved the operating costs of Sheet Aluminum Company, a competitor. Such proof was admissible. American Can Co. v. Ladoga Canning Co. (C. C. A.) 44 F.(2d) 763, 770.

■ The plaintiff introduced in evidence copies of the London Times to show the price of aluminum in England in 1925–1927 was higher than the then export price and to show that in 1928–1931 no export price was quoted. There was no error in

so doing. Commonwealth of Virginia v. State of West Virginia, 238 U. S. 202, 212, 35 S. Ct. 795, 59 L. Ed. 1272. The weight of such evidence was wholly for the jury.

A copy of a tentative agreement between defendant's Canadian subsidiary, Northern Aluminum Company, and some foreign aluminum producing companies dated April 28, 1912, was introduced, as were the minutes of meetings of representatives of the companies, parties to agreement, and to one dated June 10, 1912. The tentative agreement was admissible under our former opinion, but the minutes to be so admissible should have been properly authenticated. Esnault-Pelterie v. Chance Vought Corp. (D. C.) 56 F.(2d) 393, 407. This applies also to the minutes of proceedings of meetings of a committee of an Aluminum Association which had been formed on June 10, 1912, for the purpose of controlling sales of aluminum outside of the United States and were introduced apparently to show the attendance of A. V. Davis at a meeting he had testified that he did not remember having attended.

The exceptions to the charge as given are without merit. What was said in its entirety fairly covered the issues. The defendant filed sixty-six requests to charge and took a general exception to the claimed failure of the court to comply with fifty-one of them which were designated in the exception only by their numbers. Such an exception fails utterly in pointing out to the court wherein essential matter has been omitted in order that a correction may be made, if required, in time to be of benefit at the trial, J. M. Robinson & Co. v. Belt, 187 U. S. 41, 23 S. Ct. 16, 47 L. Ed. 65, and serves only as a catch-all for error to urge on appeal. The judge was entitled to have his attention called directly to what were claimed to be specific errors or omissions and could not be required to go over a mass of numbered requests to pick out the wheat from the chaff. This exception is valueless for that reason alone. Silkworth v. United States (C. C. A.) 10 F.(2d) 711; Hamburg-American Steam Packet Co. v. United States (C. C. A.) 250 F. 747; Penn. R. Co. v. Minds, 250 U. S. 368, 39 S. Ct. 531, 63 L. Ed. 1039.

On the question of damages a witness named Hall, who was qualified generally as an expert consulting engineer and had appraised manufacturing plants for about fifteen years, testified as to the value of plaintiff's plant. A comparatively small part of the value he assigned to it, on the hypothesis that it would be operated on the basis of a free and open market for raw material, related to the land on which it stood. Concerning that valuation he was shown to have had very meager knowledge —too little to make his opinion of the value of the land itself admissible. Moreover, he was asked to assume in making his valuation of the plant that there was in 1925 "a reasonable prospect of profitable operation." This was an assumption impossible to be made in view of the evidence. The plaintiff had never operated its plant at a profit. Its net loss in 1919 had been $77,000; in 1920, $115,000; in 1921, $86,000; in 1922, $115,578.35; in 1923, $84,725; and in 1924, $112,389.13. In the light of this record, it required substantial evidence of changed conditions to make the assumption of a reasonable expectation of profit in 1925 anything but unfounded optimism and there was no such evidence. Furthermore, the actual experience of the plant was a net loss in 1925 and each succeeding year comparable in amount with those already given. The plaintiff's damages, if any, suffered more than six years before this suit was brought, were not recoverable because of the bar of the statute of limitations. The base valuation of its plant consequently had to be shown as of 1925, and it was error to value it except with reference to conditions then actually existing.

The plaintiff was permitted to show by Haskell his estimate of its loss of profits during the period for which recovery was permitted. As there had never been any profits and no reasonable prospect that any would be made was shown as of 1925, his estimate was nothing but a guess based on conditions contrary to fact. It was too speculative to be admissible. Eastman Kodak Co. v. Blackmore (C. C. A.) 277 F. 694; American Sea Green Slate Co. v. O'Halloran (C. C. A.) 229 F. 77; Central Coal & Coke Co. v. Hartman (C. C. A.) 111 F. 96. In Wm. H. Rankin Co. v. Associated Bill Posters, 42 F.(2d) 152, we upheld the admission of an estimate of lost profits, but there was a proper basis for estimate in that case afforded by a period of profitable operation prior to the defendants' unlawful interference which prevented a continuance of the former success.

The very large attorney's fee allowed at this trial should not be deemed to have

been either approved or disapproved by us. If and when occasion for another allowance should arise, it will be for the trial judge to determine in the first instance wholly in the exercise of his own sound judgment based upon then existing facts what should be the amount of the reasonable attorney's fee which the statute provides should be allowed a successful plaintiff in a case of this kind.

Judgment reversed, and cause remanded.

MANTON, Circuit Judge (dissenting).

The theory of the appellee's case, and the statement of the essential facts which sustain it, may be found in Baush Machine Tool Co. v. Aluminum Co., 72 F. (2d) 236. Concededly, the appellee presented jury questions as to the monopolistic control of the aluminum business and the consequent damages from unlawful restraint and competition in trade through its control in domestic and foreign commerce.

The learned trial court exhibited patience, learning, and integrity in this trial, and an appellate court should not cause a reversal, requiring another and third trial—necessarily protracted, unless some serious error has been committed. Each of the two trials occupied upwards of nine weeks, with a record here presented of some 2,275 pages of testimony and 559 exhibits.

At the commencement of the trial, the court cautioned the jury: "Now, maybe you will hear discussions, but we must be emphatically sure to cast anything that occurred in the other trial or any decision out of our minds. The responsibility is on us to try this case as we think it ought to be tried and decide it just as you think it ought to be decided." And at its conclusion, the court said: "The responsibility to the plaintiff and to the defendant is yours on all the questions of fact. Decide them as your reason and conscience dictate. I do not think I have said anything during the trial or in charging you from which you can infer which way I think you should decide the case, but if you have drawn any such inferences, you should strike them out of your mind and not consider them in the least. It is no concern of mine which way your verdict goes. That is for you, and you alone, to decide."

During the course of this trial, questions as to the admissibility of evidence arose and, over the appellant's objection, the trial court permitted the appellee to read parts of this court's opinion on the former appeal for his instruction and enlightenment. Appellant assigns the reading of such parts as prejudicial error, requiring the granting of a new trial. Properly to decide whether or not this action on the part of the trial judge constituted error requires an examination of the circumstances occasioning the reading. The appellee, in presenting its case, called one Babson as a witness and inquired of him as to what the sales director of the Swiss Aluminum Company said to him when the witness was in Switzerland in 1929. The Swiss Company was shown to have been affiliated with the appellant. It was objected to as hearsay testimony, and considerable argument followed, much of which is found in the prevailing opinion. The court ruled the question admissible on one particular ground. Counsel urged broader grounds for its admission because of our former decision. Appellee's counsel, in his argument to the court, read from our opinion, as he clearly should, since the court requested it. What was read from the opinion was our pronouncement of the law of the case. What was read did not state facts or evidence. Indeed, what was written by us was to point out the error of excluding evidence of like character offered at the first trial. What was read stated that evidence was admissible for described purposes and that such evidence would be sufficient to support a finding by the jury. When the reading was concluded, the trial judge declared that he had not thought of that theory of the case. Appellant's objection was that such reading of the opinion constituted introducing hearsay testimony—which, of course, it was not.

During the argument, the foreman of the jury, in a very matter of fact and common sense way, answered the claim of this alleged error by suggesting that the judge would probably have instructed the jury in the language of the opinion read in ultimately stating the law of the case to them. And so he did, being guided, as he must, by what this court announced to be the rule of law applicable. In the charge, the court said, as to declarations of coconspirators in pursuance of a con-

spiracy: "If you find that there was a conspiracy to fix or maintain prices, then you will consider the declarations of Morrison of the British company to Haskell, the declarations of Barrand of the French company to Haskell, and the declarations of Kaufman of the Swiss company to Babson, if you decide those declarations were made. If you fail to find there was a conspiracy, then you will not consider the declarations of Morrison, Barrand or Kaufman. Strike all those declarations out of your mind for they are not evidence against the defendant unless there was a conspiracy."

The question asked of Babson, to which objection was made, appears in the prevailing opinion. Its pertinency and relevancy is made clear in that part of our opinion quoted.

Appellant called MacDowell, a sales agent for Aluminium, Limited, who, through its subsidiary, was selling aluminum in Japan. Aluminium, Limited, was controlled by appellant. On cross-examination appellee inquired as to the prices of aluminum in Japan. Objection was made that the prices in Japan were "too remote." In the course of the discussion that followed, the court asked if this court said anything in its opinion about its admissibility. Thereupon the trial judge asked appellee's counsel to read to him that part of the opinion which appellee's counsel contended covered the point. The prevailing opinion contains that part of the record covering the discussion which followed and the opinion read in response to the court's request, which clearly established the relevancy of the testimony as to the Japanese price. MacDowell's testimony which followed this discussion tended to show a conspiracy to monopolize the foreign markets as well as the domestic. Likewise, it showed the importance of price maintenance in the scheme of monopolizing the aluminum business. Aluminium, Limited, and the foreign producers entered into an agreement relative to trade in Japan. Prior thereto they had been selling in competition in Japan. Japan is further removed from the plants of the Aluminium, Limited, and of the foreign producers, than is the United States, and it was of importance to show the price in Japan was under 16 cents, whereas it was 24.3 cents in the United States. We pointed this out in our opinion 72 F.(2d) 236, 240.

We are not here concerned with the reading of a reversing opinion to a jury on the second trial. A sound distinction has been drawn between reading such opinion to a jury as part of an argument to them, and reading such opinions as being instructive to the court in persuading it as to a legal question. State court cases which consider the reading of reported cases to a jury are: Ray v. C. & O. Ry. Co., 57 W. Va. 333, 50 S. E. 413; Clark v. Iowa Central Ry. Co., 162 Iowa, 630, 144 S. E. 332, Ann. Cas. 1916B, 457; Olney v. B. & M. R., 73 N. H. 85, 59 A. 387; Hudson v. Hudson, 90 Ga. 581, 16 S. E. 349; Huckabee v. Grace, 48 Ga. App. 621, 173 S. E. 744; Baker v. City of Madison, 62 Wis. 137, 22 N. W. 141, 583; Warren v. Wallis, Landes & Co., 42 Tex. 472.

But some state courts hold that even reading law books during the course of argument to the jury does not constitute reversible error. Steffenson v. C., M. & St. P. R. Co., 48 Minn. 285, 51 N. W. 610; Williams v. Spokane Falls & N. Ry. Co., 39 Wash. 77, 80 P. 1100.

Other cases hold that the reading of opinions to the jury is a matter within the discretion of the trial judge. Gilberson v. Miller Mining & Smelting Co., 4 Utah, 46, 5 P. 699; Ft. Worth & D. C. Ry. Co. v. Stalcup (Tex. Civ. App.) 167 S. W. 279; Gallagher v. Town of Buckley, 31 Wash. 380, 72 P. 79; Mahoney v. Dixon, 34 Mont. 454, 87 P. 452; Boltz v. Town of Sullivan, 101 Wis. 608, 77 N. W. 870; City of Tuscaloosa v. Hill, 14 Ala. App. 541, 69 So. 486.

But cases involving the reading of opinions to the jury are not in point. We are here concerned with the propriety of reading a decision to the court in the jury's presence. We are referred to no case, either in the prevailing opinion or in the briefs, which holds that reading a reversing opinion to the court in the presence of the jury constitutes error. The cases dealing with the question have held that such reading is a proper practice. St. L. S. W. Ry. Co. v. Ross, 55 Tex. Civ. App. 622, 119 S. W. 725; Denison v. Lewis, 5 App. D. C. 328; Alabama Power Co. v. Berry, 222 Ala. 20, 130 So. 541; Gulf, C. & S. F. Ry. v. Bell, 24 Tex. Civ. App. 579, 58 S. W. 614; M., K. & T. Ry. Co. v. Dunbar, 49 Tex. Civ. App. 12, 108 S. W. 500. In the last-cited case, the court distinguished particularly between reading to

*the jury* and reading *to the court* in the hearing of the jury. See, also, Betts v. Western Union Tel. Co., 167 N. C. 75, 83 S. E. 164; Western Union Tel. Co. v. Benson, 159 Ala. 254, 48 So. 712; Dismukes v. Trivers Clothing Co., Inc., 221 Ala. 29, 127 So. 188; Cashwell v. Fayetteville Pepsi-Cola Bottling Co., 174 N. C. 324, 327, 93 S. E. 901.

Here the court was confronted on two occasions with the question of admissibility of evidence. Counsel for the appellee had the professional duty, and therefore the absolute right, to advise the court on these questions if the court deemed such advice to be helpful to aid him in arriving at the proper conclusion as to the admissibility of the evidence, and this is all that was done by counsel in reading the pertinent portions of this court's opinion on the former appeal. It is an everyday incident in the trial of cases and not subject to review on appeal. Grunburg v. United States (C. C. A. 1) 145 F. 81. The trial judge was capable of determining whether the course of action pursued by counsel was calculated to prejudice the minds of the jury and make them incompetent triers of the facts. To grant this reversal greatly underestimates the discretion and capabilities, both of the judge and the jurors. Any fair reading of what transpired during this trial shows that the portions of the opinion were read, not to show how the jury should find the facts in the case before them, but merely to show that certain evidence was relevant and admissible.

The federal authorities considering the subject are: Hopt v. Utah, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708; Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; Mich. Mutual Life Ins. Co. v. Oliver (C. C. A.) 256 F. 212, 215, cert. denied Id., 250 U. S. 646, 39 S. Ct. 494, 63 L. Ed. 1187.

In Press Publishing Co. v. McDonald (C. C. A.) 63 F. 238, 248, an opinion of a judge overruling a demurrer to the complaint was read *to the jury in extenso* wherein the judge writing concluded with the statement, "whether a libelous sense or an innocent sense is to be attributed to the publication (in this case) must be determined by the jury under proper instructions," but added more as his interpretation of the libel there charged. This court said: "Judge Wallace unmistakably indicated that in his opinion 'the first impression upon reading a paragraph like this would be that the person referred to had been guilty of some breach of trust,' etc." The case was reversed for reading *to the jury* the opinion of the appellate court on the facts. In Michigan Life Ins. Co. v. Oliver, supra, the Fifth Circuit considered a case wherein counsel reading to the jury was prohibited on objection, but was permitted, over objection, to read the opinion for the court's enlightenment in the presence of the jury. There, as here, the court indicated the desire to have the law expounded by the appellate court read to him, and it was held not to be error to so read to the court. In Grunberg v. United States (C. C. A.) 145 F. 81, 86, the First Circuit, over objection, permitted a plea of guilty by one jointly indicted with others to be received in the presence of the jury. What the court stated there is applicable here: "The true answer to the whole is that this was one of the ordinary incidents of a trial which is within the discretion of the court, and which we cannot revise."

In the instant case what was read *to the court* in each instance bore on the questions under consideration by the judge. He wanted assistance and asked that the opinion be read each time. If he thought what was being read to him was immaterial to the question, it was he who could and would have stopped further reading. Moreover, it is plain from that portion of the opinion read, that the evidence was admissible for the purposes urged by the appellee's counsel. A reading of the opinion justified the contentions made. Moreover, as stated, the court instructed the jury to make their own decision as of the facts; there was "no curtailment of the scope of the jury's independent judgment as to the weight of the evidence," as suggested.

What is said in the prevailing opinion as to the influence exerted in reading the law of the case, not to the jury, but to the judge at his request, ignores the ordinary intelligence and integrity found in juries. What was read in their presence later became a part of the charge in the submission of the case to them. It was intended by this court as directions as to the law of the case. "Universal distrust creates universal incompetence. In the courts of the United States the judge and jury are assumed to be competent to play the parts that always have belonged to them in the

country in which the modern jury trial had its birth." · Graham v. United States, 231 U. S. 474, 480, 34 S. Ct. 148, 151, 58 L. Ed. 319.

It is an unfortuate precedent to hold that a reversal should be granted for counsel responding to the request of the trial judge in reading to him the law of the case as stated for his guidance by his immediate appellate court. Indeed, this record is barren of any evidence that the jury heard what was read, but if it did, no possible harm could follow because jurors heard at an earlier stage of the trial what was in substance the charge of the trial court.

The only other error found in this long record is in permitting Hall to answer a hypothetical question as to the value of the appellee's plant in 1925, assuming "a reasonable prospect of profitable operation." It is said that this was an assumption impossible to make in view of the loss sustained by the appellee from 1919 to 1924. Hall's qualifications as engineer and expert were fully established. The weight of his testimony was for the jury. His qualifications were for the court. Gila Valley, G. & N. R. Co. v. Lyon, 203 U. S. 465, 27 S. Ct. 145, 51 L. Ed. 276; Chateaugay Ore & Iron Co. v. Blake, 144 U. S. 476, 12 S. Ct. 731, 36 L. Ed. 510.

The nominal value of $30,975 placed on the land could not have affected the result or prejudiced the appellant. There was ample evidence of a reasonable prospect in 1925 that the plant might be operated at a profit but for the reductions in prices below costs, made by the appellant. Obviously the value of the plant would be affected by the possibility that it might be used profitably. A reasonable probability of profitable use would cause the value to approach its cost of reproduction or cost of acquiring a similar plant. If it could not be used at a profit, it would have but junk value. Since the conditions which resulted in unprofitable operations were caused by the appellant, the diminution in value was an item of damages. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U. S. 555, 567, 51 S. Ct. 248, 75 L. Ed. 544. In the cited case, an action brought under the anti-trust act, recovery was allowed for losses in profit which the plaintiff might make but was forbidden to make because of the defendant's cutting prices below costs in competition and also for depreciation of plant, the difference between its value with a profitable business and without, or in an abandoned condition. If the jury could award damages for both these items, it surely was proper for a qualified expert, in fixing values, to assume a plant used in a reasonably profitable business, and one not used due to the defendant's unlawful acts. It must not be overlooked that appellee's unprofitable business from 1914 to 1925 was due to appellant's wrongful acts. It was for the jury to determine the weight of the evidence, the credit to be given the witness, and the extent to which his testimony should be acted upon. That there was actual damage due to depreciation in the value of the plant was not a matter of speculation. The amount of the jury's verdict seems to indicate that it was based upon this only, using the comparative values.

The judgment should be affirmed.